[No. C048156. Third Dist. Dec. 19, 2005.]

COLLEEN PATTEN, Plaintiff and Appellant, v.
GRANT JOINT UNION HIGH SCHOOL DISTRICT, Defendant and
Respondent.

**COUNSEL**

Leo F. Donahue for Plaintiff and Appellant.

Anwyl, Scoffield & Stepp, James T. Anwyl, Elisa W. Ungerman and Lynn A. Garcia for Defendant and Respondent.

## OPINION

**DAVIS, J.**—In this appeal, we conclude that the standard of "adverse employment action" that our state Supreme Court recently defined and applied to an employment retaliation lawsuit under the California Fair Employment and Housing Act (FEHA) also applies to an employment retaliation lawsuit under Labor Code section 1102.5, subdivision (b) (retaliation for whistleblowing regarding reasonably believed legal violations). (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028 [32 Cal.Rptr.3d 436] (*Yanowitz*).)

In applying this standard, we reverse a summary judgment in favor of the defendant employer, Grant Joint Union High School District (Grant). We conclude that plaintiff Colleen Patten (Patten) has raised a triable issue of material fact regarding whether her transfer from one principal position to another constituted an adverse employment action.

### BACKGROUND

At the time of the relevant events here, Labor Code section 1102.5, subdivision (b) (hereafter section 1102.5(b)) provided: "No employer shall retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or violation or noncompliance with a state or federal regulation." Section 1102.5(b) was amended in 2003, but remains substantively the same. (Stats. 2003, ch. 484, § 2.)[1]

The summary judgment papers show the following.

Patten was the principal at Foothill Farms Junior High School (Foothill) during the 2000 and 2001 school years. The year before Patten arrived as principal, Foothill had been designated an underperforming school. This made Foothill eligible for additional special funding under the Immediate Intervention/Underperforming Schools Program (II/USP).

Patten contends she disclosed four legal violations for which Grant retaliated against her.

---

[1] Labor Code section 1102.5(b) now provides: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation."

The first disclosure arose from Grant's year-end financial audit for the 2000–2001 school year. Grant discovered a surplus of approximately $127,000 in Foothill's II/USP budget. Grant wanted to reassign expenditures already incurred for at least one other educational program, and perhaps others, to nearly $104,000 of this surplus. This would allow Grant to retain this amount of unspent II/USP funds (rather than return the amount to the state) and, as Patten maintains, would provide Grant with funds to clean up its budget (Grant was allowed to hold on to the $23,000 difference in any event).

To effectuate this reassignment of expenditures, Grant, in early September 2001, requested that Patten sign blank "transfer of funds" forms. Patten refused, and explained to Grant why. According to Patten, "there was no way to ensure that the [reassigned] expenditures were legitimate based on II/USP guidelines"; she "was fearful of the legality of this action." District personnel subsequently carried out this reassignment. In October 2001, Patten met with a state Assembly member and a representative of a state senator regarding this matter.

The second disclosure also arose from events in September 2001. Patten received complaints from female students that a male physical education (P.E.) teacher at Foothill was peering into the girl's locker room. Patten disclosed this information to her district superiors for personnel action.

The third disclosure involved an off-color remark that a male science teacher at Foothill had made to a female student in April 2002. Again, Patten disclosed this information to her superiors for personnel action.

The fourth and final disclosure encompassed the issue of school safety. In April 2001, a student had been assaulted on the Foothill campus. Foothill is a large campus and, at the time, was geographically split. Patten requested on this occasion, as on others, additional staff to keep the campus safe.

Patten attended a Grant school board meeting on March 13, 2002. There, she apparently provided information related to the II/USP funding issue that contradicted what the superintendent had previously told the board.

On June 21, 2002, Grant notified Patten that she was being transferred to another principal position; this position was to a much smaller junior high school comprised of high-achieving students, the Campus Verdes Alternative Magnet School (CVAMS). Patten never began work at the CVAMS position. Patten had been diagnosed with mononucleosis in late March 2002. Although she missed about three weeks of work, she returned to duty and completed

the 2001–2002 school year at Foothill while continuing to experience symptoms of her infection through July 9, 2002. Patten's health initially precluded her from returning to work during the summer and early fall months of 2002. Eventually, she claimed in late October 2002 that she had been forced to quit her job based on Grant's retaliatory conduct.

In February 2003, Patten sued Grant for whistleblower retaliation under section 1102.5(b) (based on the four disclosures of legal violations described *ante*). She also sued Grant for constructive discharge and for violation of free speech.

The trial court upheld Grant's motion for summary judgment. The court found that only the disclosure regarding the II/USP funding constituted protected whistleblowing. As to that disclosure, however, the court determined that Grant had not retaliated against Patten by subjecting her to an adverse employment action because the wages, benefits and duties (as set forth by the job descriptions) of the CVAMS principal position were the same as at Foothill, and both schools were junior highs.

In this appeal, only the whistleblower retaliation cause of action under section 1102.5(b) is at issue.

DISCUSSION

1. *Standard of Review and the Section 1102.5(b) Cause of Action Elements*

A motion for summary judgment shall be granted if all the evidentiary papers submitted, which we review independently, show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. We do not resolve factual issues but ascertain whether there are any to resolve. (Code Civ. Proc., § 437c, subd. (c); *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 474–475 [4 Cal.Rptr.2d 522] (*Flait*); *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293, 1305 [130 Cal.Rptr.2d 347] (*Colores*).)

A defendant "may move for summary judgment in any action or proceeding if it is contended that the action has no merit." (Code Civ. Proc., § 437c, subd. (a).) A cause of action has no merit if it is shown that the plaintiff cannot establish one of the action's elements. (Code Civ. Proc., § 437c, subd. (o)(1); *Rio Linda Unified School Dist. v. Superior Court* (1997) 52 Cal.App.4th 732, 735 [60 Cal.Rptr.2d 710].)

Because a summary judgment denies the losing party a trial, we liberally construe the evidence in support of that party and resolve doubts concerning the evidence in that party's favor. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517]; *Colores, supra,* 105 Cal.App.4th at p. 1305.)

■ As noted, under section 1102.5(b), an employer may not retaliate against an employee for disclosing information to a government or law enforcement agency that the employee reasonably believes discloses a violation of, or noncompliance with, a state or federal statute or regulation. (In addition to "statute" and "regulation," the recently amended version of section 1102.5(b) adds a state or federal "rule." (Stats. 2003, ch. 484, § 2.).)

The elements of a section 1102.5(b) retaliation cause of action require that (1) the plaintiff establish a prima facie case of retaliation, (2) the defendant provide a legitimate, nonretaliatory explanation for its acts, and (3) the plaintiff show this explanation is merely a pretext for the retaliation. (See *Flait, supra,* 3 Cal.App.4th at p. 476; see also *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1453 [116 Cal.Rptr.2d 602] (*Akers*); *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 68–69 [105 Cal.Rptr.2d 652].)

We are concerned here with the first element of a section 1102.5(b) retaliation claim, establishing a prima facie case of retaliation. To do that, a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two. (*Akers, supra,* 95 Cal.App.4th at p. 1453.) Grant moved for summary judgment, contending that Patten could not establish any of these prima facie elements.

### 2. *Protected Activity*

We first consider the issue of whether Patten's disclosures regarding the P.E. teacher, the science teacher, the safety of the school, and the II/USP reassignment of expenditures, present a triable issue of material fact as constituting protected activities. We agree with the trial court that the teacher and safety disclosures do not amount to whistleblowing as a matter of law, but that the II/USP disclosures do present a triable issue of material fact of protected whistleblowing under section 1102.5(b).

The disclosures involving the two teachers do not amount to whistleblowing as a matter of law because, although the disclosures were made by a government employee (Patten) to a government agency (Grant), the disclosures

indisputably encompassed only the context of *internal personnel matters* involving a supervisor and her employee, rather than the disclosure of a legal violation. (Cf. *Colores, supra,* 105 Cal.App.4th at pp. 1308, 1312–1313 [while doing her job, a state employee uncovered the unauthorized use of state assets and reported her findings to a high-level supervisor with investigative authority over the assets; she did not have to inform some other governmental agency to qualify as a whistleblower under section 1102.5(b)]; see also, Lab. Code, § 1102.5, subd. (e) [a subdivision added in the 2003 amendment of the statute, and stating: "A report made by an employee of a government agency to his or her employer is a disclosure of information to a government or law enforcement agency pursuant to subdivision[] . . . (b)"; codifying *Gardenhire v. Housing Authority* (2000) 85 Cal.App.4th 236 [101 Cal.Rptr.2d 893]].)

In contrast to the disclosures at issue in *Colores,* Patten's disclosures regarding the two teachers simply do not rise to the level of blowing a whistle. As Patten admits in the summary judgment papers regarding the more serious of the two teacher matters (the P.E. teacher), she merely *"forwarded complaints by students of inappropriate conduct* of a Foothill . . . P.E. teacher [] on September 12, 2001, to [the] Assistant Superintendent of Human Resources . . . , District Legal Counsel . . . , and [the] Assistant Superintendent of Educational Services . . . *for personnel action."* (Italics added.) Patten's disclosure regarding the science teacher similarly was made solely in the context of an internal personnel matter based on a student complaint, rather than in the context of a legal violation.

To exalt these exclusively internal personnel disclosures with whistleblower status would create all sorts of mischief. Most damagingly, it would thrust the judiciary into micromanaging employment practices and create a legion of undeserving protected "whistleblowers" arising from the routine workings and communications of the job site. (See *Akers, supra,* 95 Cal.App.4th at p. 1455.)

We also agree with the trial court that Patten's disclosures to Grant about needing more staff for safety purposes do not amount to whistleblowing as a matter of law. Again, these disclosures were made in an exclusively internal administrative context. They do not show any belief on Patten's part that she was disclosing a violation of state or federal law in any sort of whistleblowing context, as required for a section 1102.5(b) whistleblowing action.

That leaves Patten's II/USP disclosures. Grant wisely concedes there is a triable issue of material fact as to whether these disclosures constituted protected whistleblowing. Patten's disclosures to Grant and to legislative personnel regarding the transfer of other program expenditures to the II/USP

surplus present a whistleblowing archetype—disclosing the allegedly unauthorized use of public assets. (See *Colores, supra,* 105 Cal.App.4th at pp. 1312, 1308 [the whistleblowing state employee "was simply doing her job when she uncovered the unauthorized use of state assets" and disclosed the matter to her supervisor in her own agency].) And in line with section 1102.5(b), Patten presents a triable issue that she reasonably believed she was disclosing a violation of state or federal law. She informed a state Assembly member, his assistant, and a representative of a state senator, that she had refused to sign the blank "transfer of funds" forms that Grant had requested because "there was no way to ensure the [reassigned] expenditures were legitimate based on II/USP guidelines." Patten "was fearful of the legality of this action."

Through her II/USP disclosures, Patten has raised a triable issue of material fact as to protected activity. We now turn to the prima facie retaliation elements of adverse employment action and causal link.

### 3. *Adverse Employment Action and Causal Link*

Unlike the trial court, we have the benefit of having before us the recent state Supreme Court decision in *Yanowitz,* which defined and elaborated on the legal standard for "adverse employment action" for purposes of a retaliation lawsuit under the FEHA. (*Yanowitz, supra,* 36 Cal.4th at pp. 1035–1036, 1050, 1051.)

As noted in the FEHA employment retaliation decision of *Akers,* upon which *Yanowitz* based its decision, "[u]nder the FEHA, it is unlawful '[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [the FEHA] or because the person has filed a complaint . . . under this [Act].' (Gov. Code, § 12940, subd. (h).) *Similarly,* under Labor Code section 1102.5, subdivision (b), an employer may not 'retaliate against an employee for disclosing information to a government . . . agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute . . . .' " (*Akers, supra,* 95 Cal.App.4th at p. 1453, italics added; see *Yanowitz, supra,* 36 Cal.4th at p. 1036.)

Although prior to *Yanowitz* there had been little authority in California defining an adverse employment action for purposes of a retaliation lawsuit under FEHA, there has been plenty of action in the federal courts defining this term for the analogous federal statute. (*Akers, supra,* 95 Cal.App.4th at p. 1454; see also *Thomas v. Department of Corrections* (2000) 77

Cal.App.4th 507, 510–512 [91 Cal.Rptr.2d 770] (*Thomas*).) The federal definitions run the gamut from being limited to *ultimate employment decisions* (e.g., hiring, firing, demotion), to including a range of adverse actions short of ultimate decisions that *materially affect the terms and conditions of employment*, to broadly encompassing any employer action *reasonably likely to deter* employees from engaging in protected activities. (See *Yanowitz, supra,* 36 Cal.4th at p. 1051, fn. 10; *Akers, supra,* 95 Cal.App.4th at pp. 1454–1455.) This range of definitions reflects the competing interests in defining an adverse employment action: on the one hand, guarding against both judicial micromanagement of business practices and frivolous suits over insignificant slights; on the other, discouraging employees from whistleblowing through employer retaliation. (See *Akers, supra,* 95 Cal.App.4th at p. 1455.)

██ Weighing these countervailing concerns, the court in *Yanowitz* defined an adverse employment action for FEHA retaliation purposes as requiring that the adverse action "materially affect[] the terms and conditions of employment." (*Yanowitz, supra,* 36 Cal.4th at pp. 1036, 1050–1061.) *Yanowitz* rejected the arguably broader "deterrence" test, but emphasized that the "materiality" test is not to be read miserly. (*Id.* at pp. 1036, 1050–1051, 1053–1054.) The "materiality" test encompasses not only ultimate employment decisions, "but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career." (*Id.* at p. 1054.) Minor or relatively trivial adverse actions by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee do not materially affect the terms or conditions of employment. (*Ibid.*) But the terms or conditions of employment "must be interpreted liberally and with a reasonable appreciation of the realities of the workplace [to further the fundamental antidiscrimination purposes of the FEHA]." (*Ibid.*)

The question is whether this definition of adverse employment action for FEHA retaliation lawsuits should be applied to retaliation lawsuits under section 1102.5(b). We think so. As noted, the court in *Akers* recognized a general similarity between an employee retaliation lawsuit under the FEHA and one under section 1102.5(b). (*Akers, supra,* 95 Cal.App.4th at p. 1453.)

Patten argues the contexts are not similar, and that the section 1102.5(b) context encompasses fundamental free speech rights through the disclosure of legal violations. Therefore, Patten maintains, the definition of "adverse

employment action" under section 1102.5(b) should be the broader, easier-to-meet "deterrence" test rather than the "materiality" test. We disagree.

As *Yanowitz* stated in characterizing the FEHA's underlying policy, "a 'policy that promotes the right to seek and hold employment [not to mention shelter, also covered by the FEHA] free of prejudice is fundamental.' " (*Yanowitz, supra,* 36 Cal.4th at p. 1054, fn. 14; see also Gov. Code, § 12920.) In other words, the FEHA embodies "fundamental antidiscrimination purposes." (*Yanowitz, supra,* at p. 1053; see also *Thomas, supra,* 77 Cal.App.4th at pp. 511–512.) Moreover, the FEHA employment retaliation provision protects the disclosure of a specific legal violation (antidiscrimination laws; Gov. Code, § 12940, subd. (h)), while section 1102.5(b) protects the disclosure of violations of statutes, regulations or rules generally. Many of the statutes, regulations or rules covered by section 1102.5(b) do not rise to the *fundamental* public policy purposes of FEHA. And the disclosure of discriminatory practices embodies free speech as well.

█ In light of these observations, it would be anomalous to apply a test of adverse employment action for section 1102.5(b) retaliation lawsuits—the broader "deterrence" test—that is easier to meet than the corresponding test for FEHA retaliation claims (the "materiality" test). Furthermore, as we have seen, *Yanowitz*'s definition of adverse employment action under the "materiality" test is not a crabbed, narrow one. In short, if the "materiality" test is good enough for the fundamental purposes of FEHA, it's good enough for section 1102.5(b).

Having determined the standard of adverse employment action that applies to section 1102.5(b) retaliation lawsuits—the "materiality" test—we now apply that standard to see if a triable issue of material fact on this element exists here. We may do this even though the parties and the court did not have the benefit of *Yanowitz.* This is because *Yanowitz* essentially adopted the "materiality" test set forth in *Akers,* a decision that the parties and the court did employ. (See *Yanowitz, supra,* 36 Cal.4th at p. 1036; *Akers, supra,* 95 Cal.App.4th at pp. 1454–1457.)

After the school year ended in which Patten refused to sign the blank "transfer of funds" forms to reassign other program expenditures to the II/USP surplus, Grant transferred Patten from being Foothill's principal to being the principal at CVAMS.

Grant claims there is no triable issue of material fact—this "lateral" transfer did not amount to an adverse employment action as a matter of law. This is because both Foothill and CVAMS are middle schools, and Patten's wages, benefits and duties (as set forth by job descriptions) remained the same. Moreover, the transfer accommodated Patten's health issues arising from the mononucleosis she contracted in the spring of 2002, and would have allowed her to shine in her strength—curriculum development.

Grant's view of a triable issue of adverse employment action, however, is too narrow.

█ Foothill and CVAMS presented different worlds for a principal. Foothill was an underperforming school comprised of about 1,000 students, and it was characterized as requiring immediate intervention. CVAMS, by contrast, was a magnet school for Grant's high-achieving students and comprised only about 240 students, with a high level of parental support.

At first glance, then, Patten's transfer to CVAMS as its principal resembles little of an *adverse* action. On closer examination, though, triable issues emerge. Patten was a relatively young principal with her administrative career ahead of her. In this context, a transfer from the challenge of Foothill to the pristine confines of CVAMS could be viewed unfavorably. CVAMS's student population would be small even for an elementary school in metropolitan California, let alone a middle school. And CVAMS's population is not only very small, it is a high-achieving one coupled with a great deal of parental support. In short, CVAMS does not present the kinds of administrative challenges an up-and-coming principal wanting to make her mark would relish. Patten testified in her deposition that when she arrived at Grant, a vice-principal was the administrative head at CVAMS; this was still how CVAMS in effect was viewed administratively because it was so small, and the transfer in reality was a demotion.

The "materiality" test of adverse employment action explained in *Yanowitz* looks to "the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance *or opportunity for advancement in his or her career*," and the test "must be interpreted liberally . . . with a reasonable appreciation of the realities of the workplace . . . ." (*Yanowitz, supra,* 36 Cal.4th at p. 1054, italics added; see also *Thomas, supra,* 77 Cal.App.4th at p. 511, quoting the federal Seventh Circuit's decision in *Crady v. Liberty Nat. Bank and Trust Co.* (7th Cir. 1993) 993 F.2d 132, 136 [" '[a] materially adverse [employment] change might be

indicated by . . . significantly diminished material responsibilities' "; *Yanowitz* noted that the federal Seventh Circuit has also adopted the "materiality" test *Yanowitz* adopted (*Yanowitz, supra,* 36 Cal.4th at p. 1051, fn. 10)]; compare with *Akers, supra,* 95 Cal.App.4th at p. 1457 ["a transfer into a comparable position does not meet the definition of an adverse employment action" under the "materiality" test].)

Moreover, Patten presented evidence that Grant took other actions "reasonably likely to impair . . . [her] job performance" after she made her II/USP disclosures. (*Yanowitz, supra,* 36 Cal.4th at pp. 1054–1055.) These included inadequate administrative support regarding the issues at Foothill of the P.E. teacher, the science teacher, and school safety, as well as budgetary, computer and student schedule matters.

There were additional, smaller problems with the CVAMS transfer, too. CVAMS was a year-round school that conflicted with Patten's family schedule (Patten was one of the few Grant principals with school-age children of her own; those children were on a traditional schedule, as was Foothill, and Patten had never accepted a year-round position). The transfer interfered with Patten's educational plans for her 2002 summer. And, according to Patten, it was known throughout the district that Grant planned on closing CVAMS at the end of the year in which she would be its principal.

■ Many of these actions and problems, aside from the principal transfer itself, do not rise to material adverse actions on their own. As explained in *Yanowitz,* however, "there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries . . ."; (*Yanowitz, supra,* 36 Cal.4th at p. 1055) "[e]nforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of [FEHA] [and, we add, section 1102.5(b) too]"; (*id.* at p. 1056) "[i]t is therefore appropriate that we consider plaintiff's allegations collectively." (*Ibid.*)

We conclude that Patten has raised a triable issue of material fact regarding adverse employment action.

Finally, this series of acts on Grant's part—proceeding in linear fashion from Patten's II/USP disclosures and culminating in her transfer from Foothill to CVAMS—presents a triable issue of material fact as to a "causal link" between the protected activity and the adverse employment action. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 615 [262 Cal.Rptr. 842].)

### Disposition

The summary adjudications of the second cause of action for constructive discharge and the third cause of action for violation of free speech are affirmed. In all other respects, the judgment is reversed. Patten is awarded her costs on appeal. (Cal. Rules of Court, rule 27(a).)

Sims, Acting P. J., and Butz, J., concurred.