Filed 6/23/14  Crum v. Compton Unified School Dist. CA2/2

Opinion following rehearing

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CARRIE CRUM,<br><br>            Plaintiff and Appellant,<br><br>    v.<br><br>COMPTON UNIFIED SCHOOL DISTRICT et al.,<br><br>            Defendants and Respondents. | B246985<br><br>(Los Angeles County<br>Super. Ct. No. BC481903) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Susan Bryant-Deason and Joseph R. Kalin, Judges.  Affirmed.

Akudinobi & Ikonte and Emmanuel C. Akudinobi for Plaintiff and Appellant.

Declues, Burkett & Thompson, Patricia A. Lynch and Gregory A. Wille for Defendants and Respondents.

Carrie Crum (appellant) appeals from a judgment entered after the trial court sustained without leave to amend the demurrers of Compton Unified School District (District) and Ruth Dickens (Dickens) (collectively "respondents") to appellant's causes of action for retaliation in violation of Labor Code section 1102.5 and retaliation in violation of her First Amendment rights under title 42, section 1983 of the United States Code (section 1983).

## CONTENTIONS

Appellant contends that the trial court erred in sustaining without leave to amend the District's demurrer to her cause of action for retaliation in violation of Labor Code section 1102.5 because she stated a prima facie case for retaliation and properly pled compliance with the applicable provisions of the Government Claims Act (Gov. Code, § 900 et seq.) (hereafter "the Act").

Appellant further contends that the trial court erred in sustaining respondents' demurrer without leave to amend to her cause of action for retaliation in violation of her First Amendment rights under section 1983 because she stated a prima facie case for such a violation.

Appellant argues that the trial court erred in denying her motion for new trial after sustaining the demurrer.

## FACTUAL BACKGROUND[1]

Appellant was employed by the District for over 35 years.  She began in 1969 as a teacher and spent most of her career working in the field of special education.  Appellant retired in 2008.

In 1998, while employed as a program specialist, appellant applied to the California Department of Education/Special Education Office for a "WorkAbility" program grant (the grant) to service the middle school special needs students in Compton.

---

[1]    The facts set forth in this section are allegations taken from appellant's first amended complaint (FAC), filed September 19, 2012.

2

The grant is funded by both the State of California and the federal government and is renewable each year. The grant was specially designed to be implemented by retired teachers only so that if the grant were not renewed, school district employees would not lose their jobs. The subject grant has been renewed each year since it was first secured.

Although appellant initially secured the grant, she was ineligible to service the program because she was employed by the District. She was however, eligible for a small stipend for the life of the program as long as she remained employed by the District.

In June 2008, upon her retirement from the District, appellant was eligible to participate in the WorkAbility program. She applied for, and was accepted for a position as one of three retirees servicing the grant.

The WorkAbility program is supervised by the District's Director of Special Needs. In 2005, Dickens was appointed to that position. Prior to her retirement, appellant had some concerns about the way that Dickens administered the grant. According to appellant, Dickens refused to abide by guidelines and restrictions regarding how the money for the grant should be used and who should or should not service the grant. Appellant was concerned that the grant might be revoked for noncompliance with the terms under which it was secured, and worried about the impact such a revocation would have on the students. Appellant repeatedly protested Dickens's alleged attempts to deviate from the restrictions and guidelines for implementing the grant. Appellant alleges that prior to her retirement in 2008, Dickens attempted to cut off the stipend that appellant received as author of the grant.

After her retirement from the District, when she was employed as one of the retirees servicing the grant, appellant protested Dickens's refusal to allow the retirees who were servicing the grant to attend necessary training for effective administration of the grant. In addition, appellant protested Dickens's alleged use of money secured for the grant for other purposes, such as paying the stipends of nonretirees who were not connected with the middle school program.

3

Appellant serviced the grant from September 2008 to May 2009 and from September 2009 to May 2010. While in that capacity, appellant continuously protested Dickens's alleged efforts to violate the terms and restrictions concerning the implementation of the grant. Appellant went so far as to tell Dickens that she could only act as she did if the grant was rewritten; otherwise, according to appellant, what Dickens was doing was unlawful.

In September 2010, Dickens refused to allow appellant to continue servicing the grant despite the fact that there was no shortage of available funds to run the grant and no shortage of students to service. Appellant protested her termination.

## PROCEDURAL HISTORY

On October 18, 2011, more than six months after her termination, appellant gave notice to the District of her intention to sue. She made a demand of $250,000 to conciliate her claims. Upon receipt of her notice, the District forwarded the communication to its lawyers, who contacted appellant's lawyers.

After months of reviewing the claim, on January 23, 2012, the District advised appellant it was not interested in conciliating her claim. The District did not issue a notice of rejection of appellant's claims as mandated by Government Code section 911.3, subdivision (a).

On April 2, 2012, appellant filed her complaint in this action. She stated two claims for relief: one for First Amendment retaliation in violation of section 1983 against Dickens, and a claim for retaliation in violation of Labor Code section 1102.5 against the District.

On June 29, 2012, respondents demurred to the complaint. As to the first cause of action against Dickens under section 1983, respondents argued that appellant failed to allege facts amounting to a cause of action. Specifically, respondents argued, appellant failed to allege facts from which one could conclude that her speech falls within the protection of the First Amendment. Respondents also argued that Dickens enjoys qualified immunity from civil damages where her conduct does not violate clearly established statutory or constitutional rights.

4

As to the cause of action under Labor Code section 1102.5, respondents argued that appellant failed to comply with the Act and that appellant failed to allege facts sufficient to state a cause of action. Specifically, respondents argued that appellant failed to allege that she had a reasonable belief that the reported information disclosed a violation of a state or federal statute, or a violation or noncompliance with a state or federal rule or regulation.

The demurrer was heard on August 30, 2012, at which time the trial court sustained the demurrer with 20 days leave to amend, stating only that "plaintiff has failed to state sufficient facts to support the causes of action." The hearing was not reported.[2]

Appellant filed her FAC on September 19, 2012. Respondents again demurred. As to appellant's cause of action against Dickens, respondents argued that the FAC failed to correct the defects of the original complaint. Respondents contended that appellant still had not pled facts from which one could conclude that the speech in question fell within the protection of the First Amendment. In addition, respondents argued that Dickens enjoys qualified immunity and that appellant failed to meet her burden of proving that the right she claimed was clearly established. As to her cause of action against the District, respondents argued that appellant still had not satisfied the requirement that she plead compliance with the Act, and that she failed to allege that she engaged in a protected activity under Labor Code section 1102.5, subdivision (b).

The demurrer to the FAC was heard on November 7, 2012, by a different trial court judge. On the same date, the court sustained the demurrers to the first and second causes of action in the FAC without leave to amend. As to appellant's first cause of action for retaliation in violation of the First Amendment under section 1983, the court held that "the pleading is devoid of facts showing the exact speech plaintiff stated for which retaliation has occurred, or that the [appellant] was speaking as a private citizen,

---

[2] Appellant has included in her appellate briefs references to the trial court's reasoning, which she admits were not preserved for the record. We will not consider appellant's recitations of the trial court's rationale without a recorded transcript and citations to the record.

rather than as a public employee embroiled in a personnel dispute. The [appellant] has not alleged facts showing that she acted in any way than to address an internal policy, and does not allege that she was seeking to inform the public of any kind of wrongdoing."

As to appellant's cause of action against the District for violation of Labor Code section 1102.5, the trial court found that appellant failed to properly assert allegations that she complied with the Act and would be unable to correct such defects.

Final judgment was entered against appellant on December 4, 2012. On December 14, 2012, appellant filed a notice of intent to move for new trial and a memorandum of points and authorities in support thereof. Appellant argued that respondents waived their right to assert noncompliance with the Act pursuant to Government Code section 911.3. Appellant also argued that she properly identified the protected speech and stated a cause of action under section 1983. On January 17, 2013, the motion was denied.

Appellant filed her notice of appeal from the judgment on February 15, 2013.

## DISCUSSION

### I. Standard of review

Appellant has appealed from both the underlying judgment and the denial of her motion for new trial. The ruling denying the motion for new trial is not appealable, but the order may be reviewed on appeal from the underlying judgment. (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.) We review the ruling on a motion for new trial under the deferential abuse of discretion standard. (*People v. Thompson* (2010) 49 Cal.4th 79, 140.)

We review the legal sufficiency of the complaint de novo. (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790.) "The reviewing court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff

6

has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.)

We must affirm a trial court's decision to sustain the demurrer if it was correct on any theory. (*Trinkle v. California State Lottery* (1999) 71 Cal.App.4th 1198, 1201.) Thus, an appellate court may consider new theories on appeal from the sustaining of a demurrer to challenge or justify the ruling. (*B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959.)

## II. Claim for retaliation under Labor Code section 1102.5

Appellant's main argument on appeal regarding the alleged Labor Code violation against the District involves her obligations under the Act and the District's alleged waiver of the defense of untimeliness under Government Code section 911.3.

In response, respondents argue that appellant failed to allege compliance with the Act and failed to state a cause of action under Labor Code section 1102.5

We discuss these two issues below and conclude that appellant's cause of action under Labor Code section 1102.5 must fail due to her failure to set forth a prima facie case of retaliation in violation of Labor Code § 1102.5.[3]

### A. The District waived its defense of untimeliness under Government Code section 911.3

We first address the parties' competing contentions concerning the requirement that appellant file a claim with the District pursuant to the Act.

The Act confines potential government liability to """"rigidly delineated circumstances."""" (*Zeliq v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1127.) Specifically, the Act prescribes the time and procedure for filing claims against the

---

[3] "A judgment of dismissal after a demurrer has been sustained without leave to amend will be affirmed if proper on any grounds stated in the demurrer, whether or not the court acted on that ground." (*Carman v. Alvord* (1982) 31 Cal.3d 318, 324.)

7

government, and the conditions under which the government may be sued. (*Chase v. State of California* (1977) 67 Cal.App.3d 808, 811.) The Act requires that, before filing a complaint seeking money or damages against a governmental entity, (1) the plaintiff must present the claim to the relevant governmental entity; and (2) the entity must reject the claim. (See Gov. Code, §§ 910, 911.2, 912.4, 912.6, 945.4.)

"Generally speaking, no suit for money or damages may be brought against a public entity on a cause of action for which a claim is required to be presented until a written claim has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board. . . . [¶] Under Government Code section 945.4, presentation of a timely claim is a condition precedent to the commencement of suit against a public entity." (*Munoz v. State of California* (1995) 33 Cal.App.4th 1767, 1776-1777.)

Government Code section 911.2, subdivision (a), states that "[a] claim relating to a cause of action for death or for injury to person or to personal property . . . shall be presented as provided in Article 2 (commencing with Section 915) not later than six months after the accrual of the cause of action."

Once a potential plaintiff files a claim -- even if the claim is untimely -- the government has an obligation to respond or suffer a waiver of the defense of untimeliness. Government Code section 911.3 provides:

> "(a) When a claim that is required by Section 911.2 to be presented not later than six months after accrual of the cause of action is presented after such time without the application provided in Section 911.4, the board or other person designated by it may, at any time within 45 days after the claim is presented, give written notice to the person presenting the claim that the claim was not filed timely and that it is being returned without further action. The notice shall be in substantially the following form:

> "'The claim you presented to the (insert title of board or officer) on (indicate date) is being returned because it was not presented within six months after the event or occurrence as required by law. See Sections 901 and 911.2 of the Government Code. Because the claim was not presented within the time allowed by law, no action was taken on the claim.

"Your only recourse at this time is to apply without delay to (name of public entity) for leave to present a late claim. See Sections 911.4 to 912.2, inclusive, and Section 946.6 of the Government Code. Under some circumstances, leave to present a late claim will be granted. See Section 911.6 of the Government Code.

"You may seek the advice of an attorney of your choice in connection with this matter. If you desire to consult an attorney, you should do so immediately.'

"(b) Any defense as to the time limit for presenting a claim described in subdivision (a) is waived by failure to give the notice set forth in subdivision (a) within 45 days after the claim is presented, except that no notice need be given and no waiver shall result when the claim as presented fails to state either an address to which the person presenting the claim desires notices to be sent or an address of the claimant."

Thus, under Government code section 911.3, the filing of an untimely claim "triggers a duty by the public entity to notify the potential claimant of the claim's insufficiency stating, with particularity, the defects or omissions. If the public entity fails to send this notice, it *waives* any defenses as to the sufficiency of the claim based upon a defect or omission." (*Green v. State Center Community College Dist.* (1995) 34 Cal.App.4th 1348, 1354, fn. omitted.)

In the FAC, appellant alleged that she presented her claim to the District on October 18, 2011. Appellant asserts that the District did not respond to the claim within the required statutory time frame. Because we are reviewing a demurrer, we must assume these facts are true. (*Luther v. Countrywide Financial Corp.* (2011) 195 Cal.App.4th 789, 793.)

Appellant argues that, based on these facts, the District has waived its defense of untimeliness pursuant to Government Code section 911.3, subdivision (b). Since the allegations on the face of the complaint support this argument, the demurrer was not properly sustained on the ground that appellant's claim was not timely filed.

***B. Appellant failed to allege a prima facie case of violation of Labor Code
section 1102.5***

Despite our finding that the complaint sufficiently alleges that the District waived its defense of untimeliness under the Act, we find the judgment sustaining the demurrer to this cause of action still must be affirmed on the ground that appellant failed to set forth a prima facie case for this claim.[4]

To establish a prima facie case under Labor Code section 1102.5, appellant is required to show that she engaged in protected activity; that she was subjected to an adverse employment action; and that there was a causal connection between the two. (*Edgerly, supra*, 211 Cal.App.4th at p. 1199.)

During the time period relevant to this case, Labor Code section 1102.5, subdivision (b) read: "An employer may not retaliate against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation or noncompliance with a state or federal rule or regulation." [5]

---

[4]    In our first opinion in this case we relied on a case that was published, then ordered not published, during the pendency of this appeal (*MacDonald v. State of California* (Aug. 27, 2013) C069646, opn. ordered nonpub. Nov. 26, 2013). We subsequently granted appellant's petition for rehearing, and sought supplemental briefing on the effect of the nonpublication of *MacDonald* and on the question of whether appellant set forth a prima facie case of protected activity in light of *Edgerly v. City of Oakland* (2012) 211 Cal.App.4th 1191 (*Edgerly*), and *Carter v. Escondido Union High School Dist.* (2007) 148 Cal.App.4th 922. This section of this opinion is based largely on the letter briefs received in response to our requests for supplemental briefing on rehearing.

[5]    The provision has since been revised. Effective January 1, 2014, Labor Code section 1102.5, subdivision (b) reads: "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information, or because the employer believes that the employee disclosed or may disclose information, to a government or law enforcement agency, to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance, or for providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry, if the employee has

10

Thus, for the purposes of this appeal, protected activity "is the disclosure of or opposition to 'a violation of *state* or federal *statute*, or a violation or noncompliance with a *state* or federal rule or *regulation*.' [Citation.]" (*Edgerly, supra*, 211 Cal.App.4th at p. 1199.) "In other words, '[s]ection 1102.5 of the Labor Code requires that to come within its provisions, the activity disclosed by an employee must violate a federal or state law, rule or regulation. [Citation.]' [Citation.]" (*Ibid.*) The statute on its face does not encompass the disclosure of activity which violates the terms of a grant.[6]

Appellant may survive demurrer if her allegations show that she had reasonable cause to believe that she was disclosing a violation of state or federal law. (*Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1386 (*Patten*).) We find that they do not.

Appellant alleges:

> "The WorkAbility program for the middle school students is separate and apart from that of the high school. As written, each has a separate budget; and under the terms of the grant, the District is prohibited from taking funds from one program to service the other or any other program."

As to her specific concerns regarding the WorkAbility grant, appellant alleges:

> "The Plaintiff's problems with DICKENS revolve around DICKENS refusal to abide by the guidelines and restrictions on: how the money for the grant should be used: and who should or should not service the grant.

---

reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties."

[6]     A grant is a contract. (See Congressional Research Service, Federal Grants-in-Aid Administration: A Primer (2012) p. 9 ["A grant agreement is a legally binding contract between the federal agency and the primary grant recipient"].) A contract is a legal agreement between two or more parties. (<http://thelawdictionary.org/contract-2/>.) It is the agreement itself which establishes the duties and obligations of the parties -- not any state or federal rule. Thus, an act in violation of the terms of the grant might result in revocation of the grant agreement or an action for breach of the agreement. Such an action would not necessarily involve a federal or state statute, rule or regulation.

11

Concerned about the grant being revoked for noncompliance with the terms of the grant and the impact such a revocation will have on the students, the Plaintiff as the author of the grant, repeatedly protested DICKENS attempts to deviate from the restrictions and guidelines for implementing the grant."

Thus, appellant's concern was revocation of the grant. She expressed no concern that Dickens's acts were in violation of state or federal law. Appellant has, at most, alleged a failure to abide by the terms of the WorkAbility grant.

Appellant points out that she alleged that she told Dickens that Dickens could "only make the changes she want [*sic*] if and only if the grant is rewritten, otherwise, what she is doing is unlawful." However, appellant's use of the word "unlawful" in this context does not suggest a reasonable belief that Dickens's conduct was in violation of a state or federal law, rule or regulation. Actions may be unlawful without being specifically forbidden by a state or federal law. (See, e.g., *Edgerly, supra*, 211 Cal.App.4th at p. 1205 [Edgerly's perceived violations of the City's charter and local rules and ordinances are not within the purview of Labor Code section 1102.5, and her whistleblower claim fails as a matter of law].)

Appellant also argues that the grant implicated in this appeal is funded, in part, through the Individuals with Disabilities Education Act (IDEA) (20 USC § 1400 et seq.) and Education Code section 56470 et seq. In addition, appellant explains, the California Legislature and Governor provide the guidelines on how the funds for the grant should be used.[7] However, appellant points to no specific provision making it illegal under these federal and state laws for administrators to deviate from the terms of a grant. In fact, as respondents emphasize, the law creates some leeway for the use of special education funds. (See, e.g., Ed. Code, § 56456 ["It is the intent of the Legislature that local educational agencies may use any state or local special education funds for approved vocational programs, services, and activities to satisfy the excess cost-matching

[7]     Appellant's request that we take judicial notice of certain pages from the California Department of Education website is denied, as appellant has failed to cite a statutory basis for such judicial notice and has not provided any guidance as to our authority to take judicial notice of this item.

requirements for receipt of federal vocational education funds for individuals with exceptional needs"].)

Appellant argues that her actions are akin to the protected action taken by the plaintiff in *Patten, supra*, 134 Cal.App.4th 1378. In *Patten*, the plaintiff was a former principal of Foothill Farms Junior High School (Foothill). After a year-end financial audit, it was discovered that there was a surplus resulting from Foothill's Immediate Intervention/Underperforming Schools Program (II/USP) funding. One of the alleged legal violations that the plaintiff exposed was the reassignment of expenditures from other programs to this surplus. (*Id.* at pp. 1381-1382). Significantly, the school district asked her to "sign blank 'transfer of funds' forms." (*Ibid.*) The plaintiff refused, claiming that there was no way to ensure that the expenditures were legitimate under the II/USP guidelines. The plaintiff questioned the legality of the act of signing the blank transfer forms. (*Ibid.*)

The *Patten* court agreed that the plaintiff's disclosure of this information was protected activity under Labor Code section 1102.5. The court described "the allegedly unauthorized use of public assets" as a "whistleblowing archetype." (*Patten, supra*, 134 Cal.App.4th at pp. 1385-1386.) However, in support of this statement, the *Patten* court cited *Colores v. Board of Trustees* (2003) 105 Cal.App.4th 1293 (*Colores*). In *Colores*, the whistleblower disclosed illegal acts such as "payment of overtime compensation to facilities operations staff for work not performed, or performed off-campus for the benefit of university employees; use or misappropriation of university equipment, inventories and supplies for non-campus-related work, performed for the benefit of university employees; and use of approximately $200,000 of funds slated for seismic retrofitting of university buildings but funneled instead for remodeling work" on the president of the university's office. (*Id.* at p. 1308.) This type of unauthorized use of public funds for the personal benefit of employees amounts to conversion and is clearly illegal. In contrast to this type of "unauthorized use of public assets," appellant here is not suggesting that the WorkAbility funds were used to pad the employee's pockets or upgrade the administrators' offices. Instead, she is alleging that the funds were used for

13

other expenses of the school district. There is no suggestion that those other expenses were not legitimate.

In *Patten*, the appellate court made it clear that the requirement that plaintiff show a reasonable belief that she was disclosing a violation of state or federal law was satisfied by the school district's request that she sign blank "transfer of funds" forms. (*Patten, supra*, 134 Cal.App.4th at p. 1386.) The plaintiff had refused to sign such forms because she "'was fearful of the legality of this action.'" (*Ibid.*) Had the plaintiff agreed to sign the blank forms, the money could well have gone to improper purposes such as those described in *Colores*.[8]

Appellant's allegations in this matter do not amount to such obvious impropriety. The use of funds from the WorkAbility program to cover legitimate expenses in other programs may certainly have violated the terms of the grant. However, appellant has failed to allege that such action amounted to a violation of state or federal law, or that she held a reasonable belief that it did so. For that reason, the demurrer to this cause of action was properly sustained.

---

[8]  The disclosures in *Dowell v. Contra Costa County* (N.D.Cal. 2013) 928 F.Supp.2d 1137 (*Dowell*), were similar. In *Dowell*, the plaintiff was a manager for the victim witness program for defendant Contra Costa County. The plaintiff's supervisor asked her to write an unspecified, unauthorized check for $900, indicating that he would pay the money back later. (*Id.* at p. 1143.) When the plaintiff refused the supervisor's request, the supervisor and another employee searched her office looking for the checkbook. The plaintiff reported this incident to the state granting agency. In a separate incident, the plaintiff noticed two unauthorized transfers of funds from a fund "used exclusively to pay emergency funeral burial expenses to families of homicide victims." (*Id.* at pp. 1144-1145.) The money was paid back. Again, plaintiff reported the incident, this time to the California Victim Compensation Board. The district court found that the plaintiff's allegations "that Defendants allegedly misused funds from a state agency" were sufficient to support a reasonable belief that she was reporting a violation of a federal or state statute. (*Id.* at p. 1155.) Here, appellant does not allege a "misuse" of funds, but a deviation from the restrictions and guidelines for implementing a grant. Further, there is no suggestion that, as in *Dowell*, the funds were taken in a covert manner.

14

**III. Claim for First Amendment retaliation in violation of section 1983**

    *A. Applicable law*

Section 1983 "creates a cause of action in favor of 'the party injured' against '[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any . . . person . . . to the deprivation of any rights . . . secured by the Constitution and laws . . . .' (42 U.S.C. § 1983.)" (*County of Los Angeles v. Superior Court* (1999) 21 Cal.4th 292, 297.)

Section 1983 is not itself a source of substantive rights, "'but merely provides "a method for vindicating federal rights elsewhere conferred."' [Citations.]" (*County of Los Angeles v. Superior Court, supra*, 21 Cal.4th at p. 297.) It allows actions against state or local officials for actions that have violated constitutional rights. (*Manta Management Corp. v. City of San Bernardino* (2008) 43 Cal.4th 400, 406.)

There are two essential elements of a claim under section 1983: (1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States. (*Vergos v. McNeal* (2007) 146 Cal.App.4th 1387, 1402.)

Qualified immunity is a defense to a claim under section 1983. Under the rule of qualified immunity:

> "Public officials are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' [Citation.] The plaintiff shoulders the burden of proving that the rights he claims are 'clearly established.' [Citation.] The Supreme Court has made it clear that qualified immunity provides a protection to government officers that is quite far-reaching. Indeed, it safeguards 'all but the plainly incompetent or those who knowingly violate the law. . . . If officers of reasonable competence could disagree on the issue [whether a chosen course of action is constitutional], immunity should be recognized.' [Citations.]"

(*Brewster v. Bd. of Educ.* (9th Cir. 1998) 149 F.3d 971, 977 (*Brewster*).)

15

**B. *Public employee speech does not always fall within the protection of the First Amendment***

The First Amendment protects expressions made "'"as a citizen upon matters of public concern."'" (*Garcetti v. Ceballos* (2006) 547 U.S. 410, 416 (*Ceballos*).) The speech of public employees, however, is not always protected. "[T]he Supreme Court has expressly recognized that 'the government as employer . . . has far broader powers [to restrict expression] than does the government as sovereign.' [Citation.]" (*Brewster, supra*, 149 F.3d at p. 978.)

Two inquiries guide interpretation of the constitutional protections accorded to public employee speech.

> "The first requires determining whether the employee spoke as a citizen on a matter of public concern. [Citation.] If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. [Citation.] If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. [Citation.] This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations."

(*Ceballos, supra*, 547 U.S. at p. 418.)

As set forth in *Pickering v. Bd. of Educ.* (1968) 391 U.S. 563, 568 (*Pickering*), in determining whether an employee's expression is constitutionally protected at all, courts balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." If a case of government employee speech is subject to the *Pickering* balancing test, it "will not, as a general matter, generate clearly established law." (*Moran v. Washington* (9th Cir. 1998) 147 F.3d 839, 847 (*Moran*).)

16

In *Ceballos*, the speech at issue was a memorandum drafted by Ceballos, a deputy district attorney for the Los Angeles County District Attorney's office. The memorandum addressed Ceballos's concerns regarding misrepresentations contained in an affidavit used to obtain a critical search warrant and recommending dismissal of the related prosecution. (*Ceballos, supra*, 547 U.S. at pp. 413-414.)

The *Ceballos* court held that the speech in question was not protected by the First Amendment. It was not determinative that the speech took place in Ceballos's office, or that the memorandum concerned the subject matter of his employment. (*Ceballos, supra*, 547 U.S. at p. 421.) The controlling factor was that his expressions were made pursuant to his duties as a prosecutor. The *Ceballos* court held that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." (*Ibid.*)

The *Ceballos* court explained its conclusion that Ceballos was not speaking as a public citizen:

> "Ceballos did not act as a citizen when he went about conducting his daily professional activities, such as supervising attorneys, investigating charges, and preparing filings. In the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case. When he went to work and performed the tasks he was paid to perform, Ceballos acted as a government employee. The fact that his duties sometimes required him to speak or write does not mean his supervisors were prohibited from evaluating his performance."

(*Ceballos, supra*, 547 U.S. at p. 422.)

Another pertinent example can be found in *Brewster*. In *Brewster*, a teacher alleged that his daily attendance records were being falsified by the school's attendance clerk in order to increase the school's average daily attendance, which in turn led to greater federal funding. (*Brewster, supra*, 149 F.3d at p. 975.) The teacher claimed that this allegation led to adverse employment consequences. The *Brewster* court assumed, without deciding, that the teacher's expression touched on a matter of public concern.

17

(*Id.* at p. 979.) In determining whether the speech was protected by the First Amendment, the Ninth Circuit considered several factors, including whether the speech engendered disharmony among employees, and whether the speech was directed to the media or to a governmental colleague. (*Id.* at pp. 980-981.) The court acknowledged that while not determinative, "a 'narrow, limited focus and [a] limited audience weigh against [a] claim of protected speech.' [Citation.]" (*Id.* at p. 981, fn. omitted.) While acknowledging that it was a close call, the court ultimately determined that the teacher's right to speak was not sufficiently "clearly established" to defeat the school officials' assertion of qualified immunity. (*Ibid.*)

*Moran* involved an individual employed as deputy commissioner in the Office of Insurance Commissioner, who disagreed with the Insurance Commissioner's outreach policies. (*Moran, supra*, 147 F.3d at pp. 841-842.) In evaluating Moran's claims against the Commissioner for retaliation in violation of the First Amendment, the Ninth Circuit considered Moran's position, pointing out that "the Supreme Court has expressly held that 'when close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate' [citation].'" (*Id.* at pp. 849-850.) Concluding that Moran's actions disrupted the effective functioning of the Insurance Commissioner, the Ninth Circuit concluded that "the *Pickering* balance tips demonstrably in favor of [the] Commissioner." (*Moran, supra*, at p. 850.) Moran's right to denounce her employer's outreach program was not clearly established, thus qualified immunity protected her employer from civil damages. (*Ibid.*)

Constitutional protection is imperative in some cases of government employee speech. In *Lambert v. Richard* (9th Cir. 1995) 59 F.3d 134 (*Lambert*), for example, a library employee and union representative appeared before the Santa Ana City Council on behalf of the Santa Ana City Employees Association. (*Id.* at p. 135.) She read a prepared statement in which she criticized Library Director Robert Richard's management practices. She asserted that the library was barely functioning as a result of Richard's mismanagement. (*Ibid.*) Shortly thereafter, Richard placed a letter of reprimand in Lambert's personnel file. After making a request that the letter be

18

withdrawn, Lambert sued for declaratory and injunctive relief and damages under section 1983. Under these circumstances, the district court properly granted Lambert's motion for summary judgment denying qualified immunity. The court found that the speech was undeniably a matter of public concern and that reasonable public officials would have realized that Richard's conduct was unlawful. (*Lambert, supra*, at p. 137.)

*Pickering* was also a case in which the First Amendment was implicated. In *Pickering*, a teacher was dismissed from his position for sending a letter to a local newspaper in connection with a recently imposed tax increase that was critical of how the school district had handled past proposals to raise revenue for schools. (*Pickering, supra*, 391 U.S. at p. 564.) Under the circumstances, the Supreme Court determined that a teacher's exercise of his right to speak on issues of public importance could not furnish the basis for his dismissal from public employment. (*Id.* at pp. 574-575.)

As the above discussion demonstrates, the question of whether an employee's speech is constitutionally protected must be determined on a case-by-case basis. However, as the *Moran* court pointed out, it is difficult to divine clearly established legal principles from multi-factor balancing tests such as the one mandated in *Pickering*. (*Moran, supra*, 147 F.3d at p. 847.) "However, notwithstanding our recognition of the fact that *Pickering* will not, as a general matter, generate clearly established law," we must still evaluate the allegations in the FAC to determine whether appellant has discharged her burden of alleging that the rights she claims were, at the time of her dismissal, so clearly established as to preclude a finding of qualified immunity. (*Moran, supra*, at pp. 847-848.)

### C. Appellant has failed as a matter of law to allege protected speech that falls outside the boundaries of the defense of qualified immunity

In the FAC, appellant alleges that she was employed with the District from 1969 through 2008. From September 2008 through May 2010, she serviced the grant as a retiree.

All of the speech at issue was made during the time that appellant was employed by the District. First, prior to her retirement, appellant alleges that she "repeatedly

19

protested" Dickens's alleged attempts to deviate from the restrictions and guidelines for implementing the grant.

In addition, after her retirement but during the time that appellant was reemployed as an individual responsible for servicing the grant, appellant "continuously protested" Dickens's effort to violate the terms and conditions concerning implementation of the grant. Appellant went so far as to tell Dickens that Dickens could only act as she did "if and only if the grant is rewritten." Otherwise, appellant told Dickens, what she was doing was unlawful.

The allegations thus concern speech that was limited to the confines of appellant's workplace. Appellant does not allege that she wrote a letter to a newspaper, as was the case in *Pickering*, or appeared at a city council meeting, as in *Lambert*. As discussed in *Brewster*, the question of whether the speech was directed to the media or to a governmental colleague is a relevant inquiry in determining whether an employee's expression is constitutionally protected. (*Brewster, supra*, 149 F.3d at pp. 980-981.) While not determinative, "a 'narrow, limited focus and [a] limited audience weigh against [a] claim of protected speech.' [Citation.]" (*Id.* at p. 981, fn. omitted.)

More significantly, the allegations concern expressions which were made as part of appellant's duties as an employee of the District and author of the grant. Thus, as in *Ceballos*, appellant's communications were made pursuant to her professional duties. She spoke as an employee "fulfilling a responsibility to advise [her] supervisor about how best to proceed" with implementation of the grant. (*Ceballos, supra*, 547 U.S. at p. 421.) This was the determinative factor in *Ceballos*. As the Supreme Court explained, "Ceballos did not act as a citizen when he went about conducting his daily professional activities . . . [i]n the same way he did not speak as a citizen by writing a memo that addressed the proper disposition of a pending criminal case." (*Id.* at p. 422.) Similarly, appellant did not speak as a citizen when she advised her colleague about the proper implementation of the grant. "[T]he First Amendment does not prohibit managerial discipline based on an employee's expressions made pursuant to official responsibilities." (*Ceballos, supra*, at p. 424.) Because appellant's alleged expressions fall into this

category -- and she has not suggested that she can amend her complaint to cure this defect -- her claim of unconstitutional retaliation cannot prevail.

Appellant attempts to distinguish *Ceballos*. She argues that she was never commissioned to apply for the grant, nor was it part of her core duty to run the program. However, appellant admits she was paid a stipend as author of the grant while employed by the District. Thus, part of her income was conditioned on the proper functioning of the grant. In addition, as author of the grant, appellant was well-informed of its contents. Following her retirement, appellant was formally hired to service the grant for two school years. These allegations show both a financial and a professional connection with the grant. (See *Eng v. Cooley* (9th Cir. 2009) 552 F.3d 1062, 1071 ["'Statements are made in the speaker's capacity as citizen if the speaker "had no official duty" to make the questioned statements, or if the speech was not the product of "performing the tasks the employee was paid to perform"'"].) [9] Given these allegations, appellant cannot now allege that proper implementation of the grant was outside the boundaries of her professional responsibilities.[10]

Even if appellant's allegations presented a close call, we need not determine the merits of her claim at this stage of the proceedings. Rather, we are faced with the "'much

---

[9]     Appellant cites several cases in support of her position that the issue of whether an employee is acting as a private citizen or public employee is a question of fact. However, these cases also admit that "'the ultimate constitutional significance of the [undisputed] facts' is a question of law." (*Karl v. City of Mountlake Terrace* (9th Cir. 2012) 678 F.3d 1062.) At this stage, we are assuming that all facts stated by appellant in her complaint are true. As set forth above, those facts admit a professional connection to the grant. (See *Eng v. Cooley, supra*, 552 F.3d at p. 1071 ["If the allegations demonstrate an official duty to utter the speech at issue, then the speech is unprotected"].)

[10]     Nor has appellant argued that she should be permitted to amend her complaint to allege that her professional duties did not involve the grant. If she did, we would be entitled to ignore such inconsistent allegations. (*Colapinto v. County of Riverside* (1991) 230 Cal.App.3d 147, 151 [if party attempts to avoid the defects of a complaint by omitting facts which made the previous complaint defective, or by adding facts inconsistent with those previous pleadings, we may disregard the inconsistent allegations].)

21

simpler task'" of "deciding whether the *Pickering* test so clearly favors [appellant] that it would have been unreasonable for [Dickens] to believe that [appellant's termination] was lawful." (*Brewster, supra*, 149 F.3d at p. 981.)  As was the case in *Brewster*, it would "be dubious indeed to conclude that [appellant's] right to speak was sufficiently 'clearly established' to defeat [Dickens's] assertion of qualified immunity." (*Ibid.*)

"Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.' [Citation.]" (*Pearson v. Callahan* (2009) 555 U.S. 223, 231.)  Accordingly, the Supreme Court has "'repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in litigation.' [Citation.]" (*Id.* at p. 232.)

The doctrine of qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." (*Malley v. Briggs* (1986) 475 U.S. 335, 341.)  If "officers of reasonable competence could disagree on the issue, immunity should be recognized." (*Ibid.*)  At the very least, reasonable officers could disagree on whether appellant's termination violated a clearly established right.  We therefore find that Dickens is entitled to qualified immunity and appellant's allegations against her must fail as a matter of law.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.
CHAVEZ

We concur:

_____, P. J.         _____, J.*
BOREN                               FERNS

_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.