Filed 1/29/21  Stafford v. Avenal Community Health Center CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| VIVI R. STAFFORD,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>AVENAL COMMUNITY HEALTH CENTER,<br><br>  Defendant and Respondent. | F078826<br><br>(Super. Ct. No. 17CECG03822)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kimberly A. Gaab, Judge.

Vivi R. Stafford, in pro. per, for Plaintiff and Appellant.

Kahn, Soares & Conway and Rissa A. Stuart for Defendant and Respondent.

-ooOoo-

Plaintiff sued her former employer for racial discrimination, harassment based on race, retaliation, and related causes of action.  Defendant moved for summary judgment, asserting that some element of each cause of action could not be established.  Plaintiff, acting in propria persona, filed opposition, but the trial court sustained objections to all of the evidence she proffered.  The trial court granted summary judgment, finding defendant met its burden of demonstrating that each cause of action was without merit and plaintiff failed to raise any triable issues of material fact.  Plaintiff appeals from the judgment.

We conclude the trial court correctly determined plaintiff's action lacks merit and therefore affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Vivi R. Stafford sued defendant Avenal Community Health Center, her former employer, alleging thirteen causes of action: (1) whistleblowing; (2) racial discrimination; (3) workplace violence; (4) failure to prevent harassment, discrimination, or retaliation; (5) wrongful termination in violation of public policy; (6) unlawful and unfair business practices; (7) breach of contract; (8) libel; (9) slander; (10) intentional misrepresentation; (11) harassment on the basis of race; (12) retaliation; and (13) conspiracy. She alleged she was hired by defendant to work as a physician in its clinics. She expressed concerns about defendant's non-physician chief executive officer (CEO) becoming involved in medical decisions and in creating a peer review process; when nothing was done, she complained to the Medical Board of California and defendant retaliated against her. Other employees made derogatory comments and sent a vulgar text message that plaintiff found offensive. On one occasion, an employee yelled at plaintiff and threw a pen at her. Because of plaintiff's expressed concerns or complaints, she was excluded from participating in events at a company retreat and was denied the privilege of working with patients.

Plaintiff also alleged defendant breached its contractual obligations to her by not allowing her all of her vacation time, placing her on call, and not paying her overtime compensation. On May 31, 2017, plaintiff gave 30 days' notice of her resignation after defendant failed to prevent harassment. Defendant allegedly then terminated plaintiff's employment in breach of her employment contract and in violation of public policy.

Defendant moved for summary judgment, asserting each cause of action of plaintiff's complaint was lacking some essential element. Plaintiff, acting in propria persona, opposed the motion. In reply, defendant filed objections to plaintiff's declarations and the attached exhibits, and also to the evidence plaintiff proffered along

2.

with a request for judicial notice.[1]  The trial court sustained defendant's objections, finding the exhibits submitted with plaintiff's request for judicial notice were not authenticated and were not proper subjects of judicial notice.  Further, plaintiff's declarations were not made under penalty of perjury under the laws of the State of California, were not understandable, and were of no value to the court in evaluating the merits of the motion.

The trial court concluded defendant demonstrated that at least one element of each cause of action could not be established, and plaintiff had not submitted any admissible evidence to raise a triable issue of material fact.  Accordingly, it granted defendant's motion for summary judgment and entered judgment in defendant's favor.  Plaintiff appeals.

**DISCUSSION**

**I.    Review of Summary Judgment**

Summary judgment is properly granted when no triable issue exists as to any material fact and the moving party is entitled to judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (c).)[2]  In moving for summary judgment, a "defendant … has met his or her burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action … cannot be established, or that there is a complete defense to the cause of action."  (§ 437c, subd. (p)(2).)  If the defendant does not meet that burden, the motion must be denied, even if the plaintiff has not opposed it adequately or at all.  (*Villa v. McFerren* (1995) 35 Cal.App.4th 733, 742–743.)  Once the

---

[1]      We note that the record contains plaintiff's separate statement of undisputed material facts with a one-page purported declaration attached and her request for judicial notice, which has a one-page purported declaration and 38 exhibits attached.  Plaintiff's memorandum of points and authorities in opposition, her 24-page declaration, and 20 exhibits, which are referenced in defendant's written objections, are not included in the record.

[2]      All further statutory references are to the Code of Civil Procedure unless otherwise indicated.

moving defendant has met its initial burden, however, "the burden shifts to the plaintiff … to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (§ 437c, subd. (p)(2).) The plaintiff must present facts, supported by admissible evidence, raising a triable issue of material fact. (*Id.*, subds. (b)(2), (b)(3), (p)(2); *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476–477 (*Merrill*); see *Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761.)

"Summary judgments are reviewed de novo." (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 67–68.) In our review, "we apply the same three-step analysis required of the trial court: We first identify the issues framed by the pleadings, since it is these allegations to which the motion must respond. Secondly, we determine whether the moving party has established facts which negate the opponents' claim and justify a judgment in the movant's favor. Finally, if the summary judgment motion prima facie justifies a judgment, we determine whether the opposition demonstrates the existence of a triable, material factual issue." (*Torres v. Reardon* (1992) 3 Cal.App.4th 831, 836.) On appeal, we consider "all of the evidence the parties offered in connection with the motion (except that which the court properly excluded) and the uncontradicted inferences the evidence reasonably supports." (*Merrill*, *supra*, 26 Cal.4th at p. 476.)

Although our review of the grant of summary judgment is de novo, the appellant bears the burden of showing error, even if the appellant did not bear the burden in the trial court. (*Dinslage v. City and County of San Francisco* (2016) 5 Cal.App.5th 368, 379.) The appellant must affirmatively demonstrate error and point out the triable issues the appellant claims are present by citation to the record and any supporting authority. Our review is limited to issues that have been adequately raised and briefed. (*Ibid.*) The appellant is also responsible for providing the appellate court with a record adequate to address the issues raised on appeal and demonstrate prejudicial error. (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 574; *Gee v. American Realty & Construction, Inc.* (2002) 99 Cal.App.4th 1412, 1416.)

## II. Bias of Judge

Initially, we reject plaintiff's random assertions that the trial court judge was prejudiced or biased against her. In an appellate brief, a party must "[s]tate each point under a separate heading or subheading summarizing the point, and support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court, rule 8.204(a)(1)(B).) Plaintiff's opening brief asserts in several places that the trial judge's rulings and actions may have been the result of bias, but she has made no organized argument, under a separate heading, supported by legal authority and citations to the record, to that effect. She also has not challenged the trial court's ruling denying her motion to disqualify the trial court judge.[3] We decline to address plaintiff's disorganized and unsupported assertions of bias.

## III. Evidentiary Rulings

Defendant objected to all 38 of the exhibits accompanying plaintiff's request for judicial notice on several grounds: the request was not served on defendant, the exhibits were not appropriate for judicial notice, the exhibits were not authenticated, and the exhibits constituted inadmissible hearsay. The trial court sustained defendant's objections on the grounds the exhibits submitted with the request for judicial notice were not authenticated in any way and were not proper subjects of judicial notice.

Defendant also objected to plaintiff's declarations and the 20 exhibits accompanying her opposition papers. It argued the declarations failed to establish personal knowledge of the matters asserted. Further, defendant objected to each of the exhibits on the grounds they were not authenticated and failed to present deposition testimony in the proper format. The trial court sustained the objections to the declarations and exhibits. It found the declarations did not comply with section 2015.5, which requires that a declaration indicate it was executed in the State of California or be

---

[3] The motion was assigned to and decided by a different judge than the one challenged.

5.

made under penalty of perjury under the laws of the State of California. A declaration that does not comply with section 2015.5 is of no evidentiary value. (*Kulshrestha v. First Union Commercial Corp.* (2004) 33 Cal.4th 601, 605–606, 618; *ViaView, Inc. v. Retzlaff* (2016) 1 Cal.App.5th 198, 217.) The defective declarations could not be used to authenticate or explain the exhibits accompanying the opposition.

In this appeal, plaintiff has not challenged the propriety of the trial court's rulings on defendant's objections. She also has not provided a record that includes all of the declarations and exhibits she proffered with her opposition. In our review, we may consider the evidence presented in the trial court, except evidence the trial court properly excluded. (*Merrill*, *supra*, 26 Cal.4th at p. 476.) Where the appellant does not challenge the propriety of the exclusion of evidence, that issue is deemed forfeited. (*Lopez v. Baca* (2002) 98 Cal.App.4th 1008, 1014–1015.) Thus, we consider the evidence submitted by plaintiff to have been properly excluded and we will disregard it.

When a defendant files a motion for summary judgment, the defendant must demonstrate that the plaintiff's claims have no merit. If the defendant fails to do so, the motion must be denied, even if the plaintiff has not opposed it. (*Villa v. McFerren*, *supra*, 35 Cal.App.4th at pp. 742–743.) Thus, although the trial court excluded all of the evidence submitted by plaintiff in opposition to the motion, to determine whether summary judgment was properly granted, we must determine whether defendant met its burden of demonstrating each cause of action of the complaint had no merit.

## IV.     Right-to-sue Letter

Plaintiff asserts she obtained a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC), and her right to sue cannot be extinguished through summary judgment. Plaintiff misapprehends the purpose and effect of a right-to-sue letter. The EEOC has a duty to issue a right-to-sue letter when it dismisses the employee's administrative charge, or when it fails to file a civil action or enter a conciliation agreement within 180 days after the filing of the charge. (*Scott v. Gino*

*Morena Enterprises, LLC* (9th Cir. 2018) 888 F.3d 1101, 1107.) " 'To protect aggrieved individuals from undue delay, the EEOC must issue a right-to-sue letter upon the potential plaintiff's request anytime *after 180 days* after the charges were filed.' " (*Id.* at p. 1108.) The letter represents notice that the potential plaintiff has exhausted the administrative remedy and marks the commencement of the 90-day period within which a civil action is required to be filed. (*Ibid.*) The right-to-sue letter says nothing about the validity of the potential plaintiff's claims and does not dictate any outcome or control any proceedings in the civil action. Consequently, the EEOC's issuance of a right-to-sue letter does not prevent the trial court from entering summary judgment against the plaintiff in the subsequent civil action.

## V.     Discrimination Based on Race (Second Cause of Action)

Plaintiff's second cause of action alleges defendant discriminated against her based on her race in violation of the Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.). The FEHA makes it an unlawful practice "[f]or an employer, because of the race … of any person, … to discriminate against the person in compensation or in terms, conditions, or privileges of employment." (Gov. Code, § 12940, subd. (a).) Discrimination under the FEHA must be distinguished from harassment under that act. (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 705–706 (*Roby*).) Discrimination and harassment are addressed in separate subdivisions of Government Code section 12940. (*Roby*, at pp. 705–706.) "[T]he FEHA's discrimination provision addresses only *explicit* changes in the 'terms, conditions, or privileges of employment' [citation]; that is, changes involving some *official action taken by the employer*. [Citation.] In the case of an institutional or corporate employer, the *institution or corporation itself* must have taken some official action with respect to the employee, such as hiring, firing, failing to promote, adverse job assignment, significant change in compensation or benefits, or official disciplinary action." (*Id.* at p. 706.) Harassment, in contrast, does not necessarily involve any official exercise of delegated

7.

power on behalf of the employer; it "focuses on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee." (*Ibid.*)

The elements of a cause of action for discrimination are: "(1) [the plaintiff] was a member of a protected class, (2) [s]he was qualified for the position [s]he sought or was performing competently in the position [s]he held, (3) [s]he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 355.) Defendant challenged the second cause of action as lacking an adverse employment action.

Plaintiff identifies herself as African-American. Her second cause of action was based on allegations of offensive and derogatory statements her coworkers, Christina and Betty, made in plaintiff's presence, on a derogatory text message in an exchange of texts among a group of employees on March 8, 2017, and on a threat by defendant of "serious ramifications" if plaintiff reported these racial comments.

The complaint alleged Christina walked up to plaintiff and referred to herself as half white and half black; Christina thought it was funny, but plaintiff was offended. Defendant presented plaintiff's deposition testimony that some medical assistants were having a conversation, which plaintiff was not part of. Christina said she was half white and half black and mixed race. The conversation made plaintiff uncomfortable, but she did not report it to anyone.

The complaint alleged that Betty, a medical assistant, approached plaintiff and asked why she did not wear a wig, like another African-American employee did; the comment made plaintiff uncomfortable. Plaintiff testified in deposition that, months later, Betty commented on the salt plaintiff put on her food, mentioning demographics

8.

and high blood pressure.  Plaintiff then spoke to Betty about the wig comment and Betty apologized sincerely.  Betty made no further comments plaintiff considered racial.

The complaint alleged plaintiff was referred to in a derogatory manner in text messages exchanged among employees on March 8, 2017.  Plaintiff's deposition testimony indicated that, on that date, the employees in plaintiff's care team were planning a potluck and texting about it.  Plaintiff stated they were "really sort of excited" and were discussing the dishes they would bring.  In a text to a group that included plaintiff, one employee stated that she was "taking homemade arroz con leche (rice pudding) tomorrow for breakfast or dessert or both."  Another employee, identified by defendant as Christina, responded, "Maaaaa nigga!!!!" followed by two raising hands emojis.  Others texted back:  "Yum. Thanks my favorite"; "Lol lol," followed by six hugging face emojis; and an OK hand emoji.  Plaintiff was shocked and upset by the racial epithet in the text and believed it was directed at her.

The second cause of action also alleged that, after plaintiff informed defendant of the offensive text message, defendant told her that, if she reported the racial statements, there would be serious ramifications.  Defendant allegedly failed to act on her information.

None of the alleged conduct constituted the type of adverse employment action necessary for a cause of action for racial discrimination.  None reflected an official action taken by the employer, such as firing, failing to promote, giving an adverse job assignment, making a significant change in compensation or benefits, or imposing official disciplinary action.  (See *Roby*, *supra*, 47 Cal.4th at p. 706.)  The acts appear to present a situation involving the social environment of the workplace, more appropriately addressed in a FEHA harassment cause of action.

Plaintiff's second cause of action also mentioned defendant's peer review process, although the allegations appear more concerned with how and by whom the process was created, than the manner in which the process was applied to plaintiff.  Plaintiff did not

9.

allege, for example, that defendant intentionally discriminated against her in administering the peer review process or that she was treated less favorably by defendant's peer review process than similar employees who were not African-American.

Even if the second cause of action could be interpreted to allege defendant's peer review process was applied to plaintiff in a discriminatory manner, defendant presented evidence that it was required by law to maintain a peer review system, that all service providers employed by defendant were required to participate in it, and that plaintiff received the highest score possible in the majority of categories. Plaintiff's peer review indicated three narrow areas in which plaintiff needed improvement, and she subsequently took steps to improve in those areas. Being subject to the peer review process was not, in itself, an adverse employment action, when all similarly situated employees were required to participate in it and when no personnel actions, such as discipline, demotion, or discharge resulted from it. (See *Stroy v. Gibson* (5th Cir. 2018) 896 F.3d 693, 699.)

We conclude the trial court correctly determined defendant demonstrated that plaintiff could not establish the element of an adverse employment action, and therefore could not establish her second cause of action for racial discrimination.

## VI.    Whistleblowing and Retaliation (First, Third, & Twelfth Causes of Action)

Plaintiff's first cause of action alleged defendant violated Labor Code section 1102.5 by retaliating against her for disclosing information to the Medical Board of California. Her twelfth cause of action duplicates the first cause of action, also alleging retaliation in violation of Labor Code section 1102.5. Plaintiff's third cause of action alleges retaliation for opposing discriminatory practices, in violation of the FEHA[4] (Gov. Code, § 12940, subd. (h)).

---

[4]    The caption of the complaint lists the third cause of action as one for "workplace violence." (Capitalization omitted.) The third cause of action itself is headed "hostile work environment harassment." (Capitalization omitted.) The substantive allegations, however, assert

Labor Code section 1102.5, subdivision (b) provides in pertinent part: "An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information … to a government or law enforcement agency … if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties." (Lab. Code, § 1102.5, subd. (b).) To establish a prima facie case of retaliation under this statute, "a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and (3) there is a causal link between the two." (*Patten v. Grant Joint Union High School Dist*. (2005) 134 Cal.App.4th 1378, 1384.)

Government Code section 12940, subdivision (h) makes it an unlawful employment practice "[f]or an employer … to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under [the FEHA] or because the person has filed a complaint, testified, or assisted in any proceeding under [the FEHA]." (Gov. Code, § 12940, subd. (h).) Under this statute, "[e]mployees may establish a prima facie case of unlawful retaliation by showing that (1) they engaged in activities protected by the FEHA, (2) their employers subsequently took adverse employment action against them, and (3) there was a causal connection between the protected activity and the adverse employment action." (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 472 (*Miller*).)

The same standard of "adverse employment action" applies in both retaliation claims under the FEHA and retaliation claims under Labor Code section 1102.5. (*Patten v. Grant Joint Union High School Dist.*, *supra*, 134 Cal.App.4th at p. 1381.) That

a violation of Government Code section 12940, subdivision (h), which prohibits retaliation for opposing discrimination or for filing a complaint about it.

11.

standard requires some official action by the employer, such as discharge, failure to promote, demotion, or a change in compensation or benefits. (*Roby*, *supra*, 47 Cal.4th at p. 706; *Doe v. Department of Corrections & Rehabilitation* (2019) 43 Cal.App.5th 721, 734.) An adverse employment action must be an action that materially affects the terms, conditions, or privileges of employment. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1051.) In its motion for summary judgment, defendant contended, and the trial court found, that the evidence indicated plaintiff did not suffer any adverse employment action.

Plaintiff's first and twelfth causes of action alleged she expressed concerns to the CEO about his involvement in the peer review process and in medical decisions; because her concerns were not addressed, on May 22, 2017, she sent a letter outlining her concerns to the Medical Board of California. Plaintiff alleged she was punished for expressing her concerns by being assigned to the Fresno clinic in October 2016 and by being asked to attend a company retreat April 29 and 30, 2017, where she was excluded from the activities. The first and twelfth causes of action also alleged plaintiff was punished on May 25, 2017, when she was stripped of the privilege of working with patients in the clinic.

Logically, plaintiff could not have been assigned to the Fresno clinic in October 2016 in retaliation for a complaint to the Medical Board of California that plaintiff did not make until May 22, 2017. Likewise, she could not have been excluded from activities during a retreat held April 29 and 30, 2017, in retaliation for a complaint made on May 22, 2017. Further, defendant presented uncontradicted evidence that plaintiff and her fiancé participated in all but one of the events at the retreat. Defendant also presented evidence that plaintiff was not stripped of the privilege of working with patients on May 25, 2017, but in fact worked with a number of patients each workday through May 31, 2017. On May 31, 2017, plaintiff submitted her letter of resignation to defendant, giving notice that she would resign in 30 days. Defendant accepted her resignation, excused her

from working the final 30 days, and paid her salary and unused vacation time through June 30, 2017. Thus, defendant demonstrated plaintiff could not establish any adverse employment action was taken against her in retaliation for her complaint to the Medical Board of California.

Plaintiff's third cause of action alleged she engaged in the protected activity of complaining about harassment and discrimination she experienced. She was subjected to harassing conduct in retaliation for her complaint; in February 2017, the computer software manager, Jennifer, yelled at plaintiff and threw a pen at her for expressing software concerns. The pen incident occurred when plaintiff told Jennifer someone was tampering with plaintiff's software. The third cause of action does not allege that Jennifer was aware of plaintiff's complaints of harassment and discrimination, or that Jennifer's action in yelling at plaintiff and throwing a pen at her was taken in retaliation for plaintiff's complaints of harassment and discrimination rather than in response to plaintiff's assertion that someone was tampering with her computer. In any event, yelling and throwing a pen at plaintiff did not constitute an adverse employment action that materially affected the terms, conditions, or privileges of her employment.

The trial court correctly determined defendant demonstrated there was no merit to plaintiff's first, third, and twelfth causes of action, because plaintiff could not establish any adverse employment action was taken against her.

## VII. Harassment on the Basis of Race (Eleventh Cause of Action)

Plaintiff's eleventh cause of action alleged that she was harassed during her employment with defendant based on her race, in violation of the FEHA. The FEHA makes it an unlawful employment practice "[f]or an employer … or any other person, because of race … to harass an employee …. Harassment of an employee … by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (Gov. Code, § 12940, subd. (j)(1).) To prevail on a

13.

cause of action for harassment under the FEHA, a plaintiff must prove that plaintiff was subjected to harassment such as epithets, derogatory comments, slurs, physical harassment, or other abusive conduct; the harassment was based on a protected characteristic, such as race; and the harassing conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create a hostile or abusive work environment. (*Miller*, *supra*, 36 Cal.4th at pp. 461, 462.) In its motion for summary judgment, defendant asserted plaintiff could not establish that the alleged harassment was sufficiently severe or pervasive to create a hostile or abusive work environment.

The eleventh cause of action alleged "multiple offensive and derogatory statements" made by Christina and Betty in plaintiff's presence. The statements included Christina's comment about being half white and half black, Betty's question about why plaintiff did not wear a wig, and the potluck text message. Plaintiff also alleged that, after she informed defendant of the racial comments, defendant told her to deal with them and told her if she reported the racial statements, there would be serious ramifications. The eleventh cause of action incorporated the allegations that Jennifer yelled at plaintiff and threw a pen at her. Plaintiff contends the pen incident is further evidence of harassment on the basis of race, and "[a] single instance of assault is severe or pervasive."

Plaintiff contracted to work for defendant on July 22, 2016; she began her work with defendant on September 2, 2016. Christina's comment referring to herself as half white and half black occurred in September 2016. Betty's question about why plaintiff did not wear a wig occurred in December 2016. Several months later, after the March 8, 2017 text message incident, Betty commented on plaintiff's salt usage. Jennifer threw a pen at plaintiff in February 2017. Thus, plaintiff's harassment claim is based on a small number of incidents that occurred sporadically over a nine-month period.

14.

The offensive text message that used the term "nigga" was shared among a group of employees planning a potluck. Although plaintiff stated in her deposition that she felt the term referred to her, because she was the only African-American in the texting group, in context, it does not appear to be directed at her. Viewed in the context of the exchange of texts, the term would appear to a reasonable person in plaintiff's position to be a response expressing approval to the person proposing to bring arroz con leche to the potluck.

Plaintiff criticizes the trial court by repeatedly asserting it suggested the term "nigga" could be "doled out as a badge of honor" or used as a term "of great honor amongst African Americans." The trial court did not make such a statement. It quoted from a Court of Appeal opinion discussing modern use of the words "nigger" and "nigga" as follows:

> "Nigger, however, is not the term at issue here. Rather, the term at issue is nigga. As [the plaintiff] makes clear in his declaration opposing the motion, he was not called nigger by Wayans, but nigga. Nigga is not an unambiguous racial epithet in today's world, especially when used intraracially, as it was here. In fact, one noted legal scholar, Harvard Law professor, Randall Kennedy has observed that ' "[today,] when African Americans are speaking to each other, 'nigger,' and especially its more genial cousin, 'nigga' can be an affectionate greeting, a compliment, or a term of respect." ' (Perdu and Parks, *The Nth Decree: Examining Intraracial use of the N-word in Employment Discrimination Cases* (2014) 64 DePaul L.Rev. 65, 67; see Kennedy, Nigger: The Strange Career of a Troublesome Word (2002) p. 5 ["Currently, some people insist upon distinguishing nigger—which they see as exclusively an insult—from nigga, which they view as a term capable of signaling a friendly salutation."]) [¶] (*Daniel v. Wayans* [2017] 8 Cal.App.5th [367,] 390–391, fn. omitted[, review granted May 10, 2017, S240704].)"[5]

---

[5] At the time the trial court rendered its decision, the Supreme Court had granted review of the *Daniel* case and review was pending. On September 25, 2019, the cause was transferred to Court of Appeal, Second Appellate District, Division One, with directions. Opinion was filed January 31, 2020, not for publication.

15.

The trial court concluded that, "[i]n *Daniel*, the word 'nigga' was used and received by others not as a racial slur, but a term of endearment." The trial court did not refer to the term "nigga" as one of great honor.

Plaintiff appears to argue that the term "nigga" is always a racial epithet and is so derogatory that a single use of the term is sufficient to constitute actionable harassment. She cites no legal authority for that proposition, and we have found no support for it.

One dictionary definition of "nigga" indicates the term is usually disparaging and offensive but not invariably so:

"USAGE ALERT ABOUT NIGGA

"Nigga is used mainly among African Americans, but also among other minorities and ethnicities, in a neutral or familiar way and as a friendly term of address. It is also common in rap music. However, nigga is taken to be extremely offensive when used by outsiders. Many people consider this word to be equally as offensive as nigger. The words nigger and nigga are pronounced alike in certain dialects, and so it has been claimed that they are one and the same word.

"*noun Slang: Usually Disparaging and Offensive*

"1  a term used to refer to or address a Black person." (Dictionary.com, LLC Online (2021) <https://www.dictionary.com/browse/nigga?s=t> [as of Jan. 29, 2021].)

Under the FEHA, "an employee generally cannot recover for harassment that is occasional, isolated, sporadic, or trivial; rather, the employee must show a concerted pattern of harassment of a repeated, routine, or a generalized nature." (*Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 283.) "The law prohibiting harassment is violated '[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is " 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " ' " (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 263.) Thus, a single isolated

16.

instance of the use of an offensive term is not sufficient to be actionable as harassment under the FEHA.

In determining whether the harassment was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create a hostile or abusive work environment, the work environment "must be evaluated in light of the totality of the circumstances …. 'These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " (*Miller*, *supra*, 36 Cal.4th at p. 462.) Conduct must be extreme to amount to a change in the terms and conditions of employment. (*Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 130.) As our Supreme Court has observed: " 'Common sense, and an appropriate sensibility to social context, will enable courts and juries to distinguish between simple teasing or roughhousing … and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive.' " (*Miller*, at p. 462.)

Although the use of the term "nigga" was definitely offensive and inappropriate in a workplace communication, it was not sufficiently severe alone to alter the conditions of plaintiff's employment and create an abusive working environment. The question here is whether all of the allegedly harassing conduct, collectively, was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create a hostile or abusive work environment. Plaintiff complains of a few occurrences, involving different individuals, spread out over a nine-month period.

The evidence indicated Christina's comment about being half white and half black was not made to or about plaintiff. Plaintiff simply overheard a conversation among the medical assistants in which Christina discussed being half white and half black. Plaintiff did not like the conversation; it made her really uncomfortable.

17.

Betty asked plaintiff why she did not wear a wig, like another African-American employee; plaintiff did not like the comment. Months later, Betty commented on the salt plaintiff put on her food, mentioning demographics and high blood pressure. After plaintiff told Betty the wig comment made her uncomfortable, Betty apologized and made no further comments plaintiff considered racial.

The term "nigga" was used on one occasion in a group text that plaintiff received. Viewed in context, the term was not directed at plaintiff and was used to express approval of a proposed potluck dish.

The trial court noted plaintiff claimed in her opposition "that the text message also included an 'OK' symbol, which is the sign for 'White Power.' " It stated it was unaware of such a meaning for that symbol, and plaintiff had not provided any evidence that the symbol had that meaning. The trial court stated it appeared "from the text message that it was a simple 'okay.' " We agree with the trial court that, in the context of the exchange of text messages about having arroz con leche at the potluck, the symbol reasonably appears to mean "okay." Plaintiff has not pointed us to any evidence in the record that would support some other meaning.

Plaintiff alleged she informed defendant of these racial comments and defendant told her to deal with them; on May 22, 2017, defendant allegedly said that, if plaintiff reported the racial statements, there would be serious ramifications. This vague statement does not indicate what sort of report or what sort of ramifications it contemplates; plaintiff's allegation does not indicate who made the statement.

Defendant presented evidence that plaintiff reported the March 8, 2017 text to defendant's administration on May 19, 2017, and she had not previously reported any perceived racial comments to defendant. Defendant immediately investigated, learned who made the statement in the text message and the circumstances under which it was made, then retrained and re-educated the staff regarding inappropriate workplace behavior. On May 25, 2017, defendant delivered a letter to plaintiff confirming the

18.

action taken.  The confirming letter, written by defendant's CEO, denied anyone told plaintiff to keep her complaints to herself and asserted defendant had a zero-tolerance policy for harassment and discrimination.  It stated defendant had immediately investigated the derogatory text, spoken to personnel, re-educated employees, and reviewed defendant's policy against harassment and discrimination with the staff.  The letter also asserted plaintiff's "current assertions of threats or threatened ramifications" resulting from her complaints were untrue.

Finally, plaintiff argues that Jennifer throwing a pen at her constituted assault, and a single instance of assault is severe or pervasive.  We do not believe that a single instance of an employee throwing a pen at a coworker, who was not her subordinate, particularly when there is no allegation that the pen caused injury or even struck the coworker, constitutes harassment severe enough to alter the conditions of the coworker's employment and create a hostile or abusive work environment.  (See *Miller*, *supra*, 36 Cal.4th at p. 462.)

Additionally, harassment under the FEHA is actionable only if it occurs because of race or some other protected characteristic of the plaintiff.  (Gov. Code, § 12940, subd. (j)(1).)  The complaint did not allege any facts suggesting that Jennifer threw the pen at plaintiff because of her race.  Rather, it alleged Jennifer threw the pen at plaintiff for expressing software concerns after plaintiff told Jennifer someone was tampering with plaintiff's software.

Viewed individually or collectively, these minor, occasional incidents do not demonstrate a "concerted pattern of harassment of a repeated, routine, or a generalized nature" (*Lyle v. Warner Brothers Television Productions*, *supra*, 38 Cal.4th at p. 283) that is sufficiently severe or pervasive to alter the conditions of plaintiff's employment and create a hostile or abusive work environment (*Miller*, *supra*, 36 Cal.4th at p. 462).  The incidents were few in number and spread over a nine-month period.  They involved

19.

several different individuals, not the same individual repeatedly or routinely bothering plaintiff. They did not involve a supervisor victimizing a subordinate.

Consequently, we conclude the trial court correctly determined defendant met its burden of demonstrating the harassment cause of action had no merit, and plaintiff failed to raise a triable issue of material fact, entitling defendant to summary adjudication of this cause of action.

## VIII.  Failure to Prevent Harassment, Discrimination, and Retaliation (Fourth Cause of Action)

Under the FEHA, it is an unlawful employment practice "[f]or an employer … to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring." (Gov. Code, § 12940, subd. (k).)  The fourth cause of action alleges plaintiff informed defendant of the allegedly racially harassing comments, and defendant failed to act on her information.  Plaintiff asserts the trial court ignored this cause of action.  It did not.

A plaintiff cannot recover for failure to take steps to prevent discrimination or harassment unless actionable discrimination or harassment actually occurred.  (*Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1314; *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289.)  " '[T]here's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen, for not having a policy to prevent discrimination when no discrimination occurred .…'  Employers should not be held liable to employees for failure to take necessary steps to prevent such conduct, except where the actions took place and were not prevented." (*Trujillo*, at p. 289.)  Defendant met its burden of demonstrating that plaintiff's causes of action for harassment, discrimination, and retaliation were without merit, and plaintiff raised no triable issues of material fact. Consequently, plaintiff also could not establish a cause of action for failure to prevent

harassment, discrimination, or retaliation. The trial court correctly reached this conclusion, as we do.

## IX. Wrongful Termination in Violation of Public Policy (Fifth Cause of Action)

The fifth cause of action is for wrongful termination in violation of public policy. " 'The elements of a claim for wrongful discharge in violation of public policy are (1) an employer-employee relationship, (2) the employer terminated the plaintiff's employment, (3) the termination was substantially motivated by a violation of public policy, and (4) the discharge caused the plaintiff harm.' " (*Nosal-Tabor v. Sharp Chula Vista Medical Center* (2015) 239 Cal.App.4th 1224, 1234–1235.) "[A] policy may support a wrongful discharge claim only if it satisfies four requirements. The policy must be (1) delineated in either constitutional or statutory provisions; (2) 'public' in the sense that it 'inures to the benefit of the public' rather than serving merely the interests of the individual; (3) well established at the time of the discharge; and (4) 'substantial' and 'fundamental.' " (*Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 901–902.)

The fifth cause of action alleges plaintiff gave defendant 30 days' notice of her resignation after defendant failed to prevent harassment, and defendant proceeded to terminate plaintiff. It alleges this violated Government Code section 12940, subdivision (h), which prohibits retaliation.

Defendant demonstrated that plaintiff resigned from her position with defendant. Plaintiff argues that the complaint alleges she resigned after defendant failed to prevent harassment. She contends her employment was constructively terminated by defendant. "Constructive discharge occurs when the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will. As a result, a constructive discharge is legally regarded as a firing rather than a resignation." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244–1245 (*Turner*).)

"In order to establish a constructive discharge, an employee must plead and prove … that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner*, *supra*, 7 Cal.4th at p. 1251.) "An actual or constructive discharge in violation of fundamental public policy gives rise to a tort action in favor of the terminated employee." (*Id*. at p. 1252.)

The harassing and retaliatory conduct plaintiff alleged does not meet the standard of working conditions so intolerable or aggravated that a reasonable employer would realize a reasonable person in plaintiff's position would be compelled to resign. The comments and incidents alleged were minor and sporadic rather than continuous, repeated, or routine. "In order to amount to a constructive discharge, adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable. In general, '[s]ingle, trivial, or isolated acts of [misconduct] are insufficient' to support a constructive discharge claim." (*Turner*, *supra*, 7 Cal.4th at p. 1247.)

We conclude the trial court did not err in summarily adjudicating the fifth cause of action because defendant demonstrated plaintiff could not establish the second element— that defendant actually or constructively terminated plaintiff's employment.

## X.     Breach of Contract (Seventh Cause of Action)

Plaintiff's seventh cause of action alleges breach of her employment contract. "A cause of action for breach of contract requires proof of the following elements: (1) existence of the contract; (2) plaintiff's performance or excuse for nonperformance; (3) defendant's breach; and (4) damages to plaintiff as a result of the breach." (*CDF Firefighters v. Maldonado* (2008) 158 Cal.App.4th 1226, 1239.)

Plaintiff alleges defendant breached the contract by allowing her only eight hours of vacation for the year, when the contract provided for 80 hours, earned progressively

throughout the year; by placing her "on-call all time [*sic*] on or around November 2016"; by requiring plaintiff to consistently exceed 40 hours in a work week; and by discharging her after she gave 30 days' notice of resignation.

Regarding vacation time, defendant presented evidence that plaintiff's contract provided for 80 hours of paid leave earned progressively during the year; plaintiff accrued 70.84 hours of vacation during her nine months of employment; she used 56 hours of vacation time; and she was paid for an additional 14.84 hours upon her resignation. There was no contrary admissible evidence.

Regarding on-call services, the contract provided that plaintiff's on-call schedule would be designed to meet her needs and "be consistent with the call systems in place within the local medical community." Defendant presented evidence that plaintiff was never given primary on-call duty and the level of on-call duty she was assigned was lower than that normally assigned to medical service providers in the local community.

Regarding the allegation plaintiff was required to consistently exceed 40 work hours per week, the contract required her to provide medical services as a salaried full-time employee for a *minimum* of 40 hours of clinical time per week. Thus, requiring more than 40 work hours per week was not a breach of the contract.

Regarding the allegation defendant terminated plaintiff's employment, the evidence indicated plaintiff gave 30 days' notice of her resignation; thus, her employment was not terminated by defendant. Defendant merely accepted her resignation, excused her from further performance during the remaining 30-day period, and paid her through that period. We have already determined plaintiff cannot establish a constructive termination based on her allegations.

We conclude defendant demonstrated that plaintiff cannot establish a cause of action for breach of the employment contract, and therefore adjudication of this cause of action in defendant's favor was proper.

23.

## XI.  Misrepresentation (Tenth Cause of Action)

Plaintiff's tenth cause of action is headed "intentional misrepresentation." (Capitalization omitted.)  It alleges that, when plaintiff was hired, defendant made promises it did not intend to perform.  Defendant needed to hire a physician with opioid experience in order to qualify for a federal grant, and plaintiff's resume fit the requirements.  Plaintiff was hired due to her opioid experience.  After receiving the federal grant, defendant intentionally harassed plaintiff to create a hostile work environment.

The trial court treated the claim as one based on promissory fraud, that is, a promise made without intention of performing it.  "Promissory fraud or false promise ' "is a subspecies of [the action for] fraud and deceit.  A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud. [Citations.]" ' [Citations.] [¶] 'The elements of promissory fraud ... are:  (1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; (3) intent to deceive or induce the promisee to enter into a transaction; (4) reasonable reliance by the promisee; (5) nonperformance by the party making the promise; and (6) resulting damage to the promise[e].' " (*Rossberg v. Bank of America, N.A.* (2013) 219 Cal.App.4th 1481, 1498.)

Addressing the fifth element, defendant presented evidence that it did not breach the contract; it addressed the allegations set out in the breach of contract cause of action.  Additionally, defendant provided evidence that it applied for a Health Resources and Services Administration Substance Abuse Service Expansion in October 2015, almost a year prior to the date plaintiff was hired, and Dr. Phui was identified as the physician of record for the program; defendant was awarded the grant.  Defendant asserts these facts disprove plaintiff's allegation that defendant promised to perform the employment

contract in order to induce plaintiff to work for defendant, so defendant would qualify for the federal grant.

Our previous discussion of the wrongful termination cause of action negates the fifth element—nonperformance of the promise—to the extent plaintiff contends defendant's failure to perform the contract consisted of subjecting her to racial harassment sufficient to constructively discharge her from defendant's employment. As we concluded with respect to the wrongful termination cause of action, the acts plaintiff alleged as harassment consisted of minor, occasional acts by several different people rather than a concerted pattern of pervasive harassment designed to bring about a constructive termination.

Plaintiff's argument of error as to this cause of action is unclear. She first states defendant made promises to induce plaintiff to act on them. She repeats the complaint's allegations about being hired to qualify for a grant and being harassed after the grant was received. Subsequently, she argues the trial court recharacterized the cause of action as one for promissory fraud, when it was actually for fraud by concealment. The tenth cause of action, however, did not allege concealment of anything other than the alleged intention not to perform as promised. Accordingly, we conclude the trial court correctly concluded defendant met its burden of demonstrating this cause of action was without merit, and plaintiff failed to raise a triable issue of material fact.

## XII. Conspiracy (Thirteenth Cause of Action)

The thirteenth cause of action of plaintiff's complaint is headed "conspiracy." (Capitalization omitted.) Civil conspiracy is not an independent tort. (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1581.) The basis of a civil conspiracy is the formation of a group of two or more persons who have agreed to a common plan or design to commit a tortious act. (*Id.* at p. 1582.) " ' "A civil conspiracy, however atrocious, does not per se give rise to a cause of action unless a civil wrong has been committed resulting in damage." ' " (*Applied Equipment Corp. v. Litton Saudi Arabia*

*Ltd.* (1994) 7 Cal.4th 503, 511.)  A cause of action for conspiracy to commit a tort includes three elements:  (1) the formation and operation of the conspiracy, (2) wrongful act or acts done in furtherance of the conspiracy, and (3) damages arising from the wrongful conduct.  (*Ibid*.)

The thirteenth cause of action alleges "[d]efendant knowingly and willingly conspired and agreed among themselves to defraud Plaintiff."  It alleges plaintiff "relied upon the employment [contract] and believed it to be true."  Thus, it seems to refer back to the tenth cause of action for misrepresentation as the tort supporting the alleged conspiracy.  The tenth cause of action alleged defendant made promises in the employment contract that it did not intend to perform.  In her briefs, plaintiff argues unspecified defendants conspired to defraud her, she relied on the employment contract and believed it to be true, and defendant had no intention of abiding by the contract.  As previously discussed, defendant demonstrated the fraud cause of action was without merit.  Because the underlying tort cannot be established, the second element—a wrongful act committed in furtherance of the conspiracy—is lacking.

Further, a conspiracy requires multiple persons forming an agreement together.  Although the complaint names a number of Doe defendants, the thirteenth cause of action does not identify any of them or explain who they are in relation to plaintiff or defendant, what they did to manifest an agreement to defraud plaintiff, or what they did to further the conspiracy.  The argument in plaintiff's brief does not supply any of this information.  It refers to defendant in the singular and asserts "the entire organization acted in concert and harmed" plaintiff.

"A corporate employee cannot conspire with his or her corporate employer; that would be tantamount to a person conspiring with himself.  Thus when a corporate employee acts in his or her authorized capacity on behalf of his or her corporate employer, there can be no claim of conspiracy between the corporate employer and the corporate employee.  [Citations.]  In such a circumstance, the element of concert is

26.

missing." (*Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 78.)  Thus, plaintiff's conspiracy cause of action also fails because there is no allegation or evidence that anyone outside defendant's organization conspired with it to defraud plaintiff by making promises in her employment contract with intent not to perform them.

## XIII.  Unfair Business Practices (Sixth Cause of Action)

Plaintiff's sixth cause of action alleges a claim against defendant for unfair business practices under Business and Professions Code section 17200 et seq.  It alleges defendant unlawfully or unfairly profited and was unjustly enriched when it allowed plaintiff only eight vacation hours for the year and when she worked overtime hours without compensation.  Defendant also allegedly engaged in unlawful business practices in violation of Labor Code section 1102.5 by creating substandard and detrimental working conditions.

The unfair competition law defines unfair competition to include "any unlawful, unfair or fraudulent business act or practice."  (Bus. & Prof. Code, § 17200.)  It " ' "borrows" violations of other laws and treats them as unlawful practices' that the unfair competition law makes independently actionable."  (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.)  It also broadly proscribes unfair or fraudulent practices, in order to enable courts to deal with the " 'innumerable " 'new schemes which the fertility of man's invention would contrive.' " ' " (*Id*. at p. 181.)  However, "a plaintiff may not bring an action under the unfair competition law if some other provision bars it.…  In other words, courts may not use the unfair competition law to condemn actions the Legislature permits."  (*Id*. at p. 184.)

Defendant submitted evidence disproving plaintiff's allegation that she was allowed only eight hours of vacation time a year.  Consequently, that allegation cannot establish an unfair or unlawful business practice.  Plaintiff's claim that defendant failed to pay her overtime compensation, although she consistently worked more than 40 hours per

27.

week, also cannot form the basis of a cause of action for unlawful or unfair business practices. Plaintiff contracted to be employed with defendant in its clinic as a licensed physician. Licensed physicians engaging in duties that require licensure as a physician are generally exempt from payment of overtime wages. (Lab. Code, § 515.6, subd. (a).) Since the law exempts physicians from payment of overtime wages, the courts may not use the unfair competition law to effectively require the employer to pay it.

Plaintiff's final allegation seems to be that defendant engaged in an unlawful business practice by violating Labor Code section 1102.5, which prohibits an employer from retaliating against an employee for disclosing to a government agency information about suspected illegal conduct. As we concluded in our review of the ruling on the first cause of action, the evidence demonstrated that the retaliatory acts plaintiff identified as those violating Labor Code section 1102.5 either did not occur at all or occurred prior to her report to the Medical Board of California. Consequently, they could not have occurred in retaliation for plaintiff's report to the Medical Board of California.

The trial court did not err in summarily adjudicating this cause of action in favor of defendant.

## XIV. Libel and Slander (Eighth & Ninth Causes of Action)

Libel and slander are forms of defamation. (Civ. Code, § 44.) "The tort of defamation 'involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage.' " (*Taus v. Loftus* (2007) 40 Cal.4th 683, 720.) Libel is defamation in written, printed, or picture form; slander is oral defamation. (Civ. Code, §§ 45, 46.)

"A viable defamation claim requires the existence of a provable falsehood. [Citations.] ' " 'Statements do not imply a provably false factual assertion and thus cannot form the basis of a defamation action if they cannot " 'reasonably [be] interpreted as stating actual facts' about an individual." ' " ' " (*Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 289.) Rhetorical hyperbole, vigorous epithets, lusty and

28.

imaginative expressions of contempt, and language used in a loose and figurative sense do not constitute provably false factual assertions. (*Nygård, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1048.)

" ' "Because [a defamatory] statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability. Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected." ' " (*Medical Marijuana, Inc. v. ProjectCBD.com* (2020) 46 Cal.App.5th 869, 884.) The court applies a totality of the circumstances test to determine whether a statement is fact or opinion; it looks to the language of the statement itself and the context in which the statement was made. (*Hawran v. Hixson*, *supra*, 209 Cal.App.4th at p. 289.) "Whether challenged statements convey the requisite factual imputation is ordinarily a question of law for the court." (*Id.* at p. 290.)

Plaintiff's eighth cause of action for libel alleges plaintiff was referred to in a derogatory manner in the March 8, 2017 text messages exchanged among defendant's employees. In the text messages, one employee stated she was "taking homemade arroz con leche (rice pudding)" to the potluck. Christina responded, "Maaaaa nigga!!!!" followed by two raising hands emojis. Others texted their approval of the proposed dish: "Yum. Thanks my favorite"; "Lol lol," followed by six hugging face emojis; and an OK hand emoji. Plaintiff described the medical assistants involved in the conversation as "excited," tossing around ideas for what dishes to bring.

After considering the totality of the circumstances—the language of the statement made and the context in which it was made—we conclude the racial epithet to which plaintiff objects cannot reasonably be interpreted as stating any actual fact about plaintiff. In the absence of a factual statement about plaintiff, the eighth cause of action does not present a viable cause of action for libel.

Plaintiff's ninth cause of action for slander alleges Christina and Betty made multiple offensive and derogatory statements in plaintiff's presence, referring to plaintiff's multiracial identity as funny and disgusting. Christina and Betty made the statements to each other and in plaintiff's presence. Defendant harmed plaintiff by permitting other employees to make statements to plaintiff.

Plaintiff's own deposition testimony showed plaintiff identified herself as African-American, not multiracial. Christina told others, in plaintiff's presence, that Christina was half white and half black; she did not comment on plaintiff's racial background. As plaintiff recounted the conversation: "[W]hen I first started working there, it was some kind of conversation between the medical assistants about being … half white and half black and specifically Christina. She was saying something about … being half white and half black and … mixed race, that sort of thing.… And it was this whole conversation.… I was not part of the conversation. I stayed out of the conversation.… It made me feel really uncomfortable."

As described by plaintiff, Christina's comments related to her own multiracial heritage, not plaintiff's. Christina made no factual statement about plaintiff or her heritage.

Betty also made no factual statements about plaintiff. Plaintiff testified in deposition:

> "A.  [Betty] had come up to me and said to me, 'Why don't you wear a wig like one of the other medical assistants does?'
>
> "Q.  And why did you find that inappropriate or discrimination?
>
> "A.  Because I thought my hair was kind of nice.
>
> "Q.  Do you attribute persons wearing a wig to only African-Americans?

30.

"A.    Well, they said that they didn't understand why I wore it like the other African-American on the premises wore one.  So I -- I didn't like the statement."

Betty asked plaintiff a question about why she did not wear a wig; it was not a factual statement that could be proven false.  Even if the question implied a criticism of plaintiff's appearance or choice of hairstyle, it would present only a matter of opinion, not a provably false factual assertion.

Betty also commented on the salt plaintiff put on her food.  As plaintiff described it:  "We were all eating or something like that.  And then when we were eating, [Betty] said something … like 'I'm watching your diet and I see you are putting a lot of salt' and something to do with … salt and … then demographics and high blood pressure."  At most, this was an implied expression of Betty's opinion that plaintiff should use less salt in her diet.  It was not a provable falsehood.

We conclude the statements made by Christina and Betty cannot reasonably be interpreted as stating any actual fact about plaintiff.  Consequently, plaintiff's ninth cause of action does not present a viable cause of action for slander.

## DISPOSITION

The judgment is affirmed.  Defendant is entitled to its costs on appeal.


HILL, P.J.

WE CONCUR:


SMITH, J.


MEEHAN, J.


31.