Filed 12/9/21  Weinstein v. City of Oakland CA1/3

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| MARLENE G. WEINSTEIN, as Trustee, etc., <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> CITY OF OAKLAND, <br><br>     Defendant and Respondent. | A161268 <br><br> (Alameda County <br> Super. Ct. No. RG17850153) |

James M. Gantt[1] filed a lawsuit against his former employer, City of Oakland (the City).  Gantt alleged the Oakland Police Department (OPD) retaliated against him for whistleblowing in violation of Labor Code section 1102.5 (further undesignated statutory references are to the Labor Code) and the Fair Employment and Housing Act (Gov. Code, § 12900 et seq. (FEHA)).  The trial court granted the City's motion for summary judgment, concluding several of Gantt's claims were time-barred and his remaining claims were legally insufficient.  It also denied Gantt's motion for a new trial and entered judgment for the City.

We affirm.

---

[1] Marlene Weinstein, as the trustee of Gantt's bankruptcy estate, is pursing these claims but we refer to Gantt throughout for ease of reference.

1

## I.  Gantt's Homicide Division Placement

Gantt joined the OPD in 1988 and became a homicide detective in 2009. In January 2014, Lieutenant A. became the head of the homicide division. Lieutenant A. and Gantt had a contentious relationship. For example, Lieutenant A. removed Gantt from an investigation into a June 2014 shooting death of an OPD officer's wife after Gantt expressed suspicions that the officer had killed his wife.[3] After he was removed from the investigation, Gantt asserted Lieutenant A. regularly pressured him to quickly finish his work; asked Gantt to arrive at work and meetings on time; and refused to authorize overtime. Gantt also alleged that, in late July 2014, junior officers improperly accessed his electronic personnel file to view a "corrective counseling" note written by Lieutenant A. Gantt believed the alleged improper viewing of his personnel file was related to Lieutenant A.'s efforts to embarrass him in the homicide unit.

Meanwhile, in May 2014, Gantt's friend, Lieutenant B., sent a racist image via text message to Gantt and a group of officers. Gantt told Lieutenant B. the image offended him. In August 2014, Gantt requested a transfer from the homicide division. After Lieutenant B. learned of the transfer, he sent the same group various text messages about Gantt's age.

---

[2] We provide an overview here and additional detail in the discussion of Gantt's specific claims. We refrain from using names or presenting detailed facts to comply with a trial court order sealing large portions of the record.

[3] Gantt also describes an Internal Affairs Division (IAD) investigation into statutory rape committed by an OPD officer. As these facts are irrelevant to Gantt's claims and our analysis, we do not discuss them. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 668, fn. 2.)

## II.  Gantt's IAD Complaints

In December 2014, Gantt filed an IAD complaint claiming Lieutenant A. created a hostile work environment by publicly disparaging him.  The following month, Gantt filed another IAD complaint asserting Lieutenant B.'s August 2014 text messages constituted harassment of, and discrimination against, Gantt because of his age.

A year later, in January 2016, Gantt received a supervisory note — a non-disciplinary action documenting a conversation between supervisor and officer — due to Gantt's failure to respond to roster requests for an operation headed by Lieutenant A.  Based on this note, Gantt's then-supervisor filed an IAD complaint on Gantt's behalf.  He alleged the supervisory note was issued in retaliation for Gantt's December 2014 complaint alleging Lieutenant A. created a hostile work environment.  IAD concluded the allegations were unfounded.

In April 2016, Gantt notified IAD of Lieutenant B.'s May 2014 racist text messages.  IAD opened a new investigation.  During its investigation, IAD discovered that Gantt sent homophobic text messages to the same group.  IAD ultimately concluded both Lieutenant B. and Gantt engaged in unprofessional conduct.  OPD suspended both officers for five days without pay.

## III.  Additional IAD Investigations of Gantt

IAD also investigated several incidents related to Gantt's conduct.  For example, in April 2016, Gantt and his wife had a domestic dispute during which Gantt brandished a firearm.  After Gantt reported the incident to IAD, it opened an investigation.  The next day, OPD placed Gantt on administrative leave.

In June 2016, while IAD was investigating Gantt's domestic dispute, a civilian lodged a complaint that Gantt mishandled evidence in a 2011 homicide investigation. This triggered an additional IAD investigation. The same month, Gantt's girlfriend announced on social media that she possessed homicide investigation materials. She also contacted Lieutenant B. and other OPD officers and expressed concern that Gantt would harm her. OPD dispatched officers to her apartment, and IAD opened yet another investigation into whether Gantt improperly disclosed evidence in multiple criminal investigations. Several days later, the City's mayor issued a press release announcing a district attorney investigation to determine whether an OPD officer engaged in criminal misconduct.

In October 2016, IAD concluded there was insufficient evidence Gantt engaged in domestic violence and exonerated him regarding the improper firearm use allegation. But the other investigations remained ongoing. OPD kept Gantt on administrative leave until February 21, 2017.

## IV. Lawsuit Against the City

On November 1, 2016, while IAD investigations continued, Gantt presented the City with a Government Claims Act claim (Gov. Code, § 910) alleging retaliation. He alleged OPD retaliated against him for making complaints about the 2014 homicide investigation and harassing conduct of other officers; the City rejected the claim. Gantt also filed an administrative complaint with the Department of Fair Employment and Housing (DFEH) on February 7, 2017, alleging retaliation, among other things. He obtained a right to sue letter the same day.

On February 21, 2017, Gantt sued the City, asserting whistleblower and retaliation claims under the Labor Code and FEHA, and seeking

damages and injunctive relief. Several months later, Gantt retired earlier than expected, citing anxiety attributable to working at OPD.

The City moved for summary judgment, which trial court granted. It concluded Gantt's whistleblower retaliation claims based on conduct occurring before May 1, 2016 — six months before Gantt filed his government claim — were time-barred. (Gov. Code, § 911.2, subd. (a).) Similarly, it found his FEHA causes of action based on conduct occurring before February 7, 2016, were untimely. As for Gantt's section 1102.5 and FEHA claims, the court determined Gantt either failed to establish a prima facie case of retaliation or that the undisputed evidence established a legitimate, nonretaliatory explanation for the adverse employment actions.

Gantt moved for a new trial, which the court denied. The court entered judgment for the City.

## DISCUSSION

### I. Summary Judgment

FEHA protects "the rights of all persons to seek, obtain, and hold employment without discrimination" on account of race, among other things. (*Salas v. Sierra Chemical Co.* (2014) 59 Cal.4th 407, 420.) Relevant here, it prohibits an employer from "discharg[ing], expel[ling], or otherwise discriminat[ing] against any person because the person has opposed any practices forbidden under [FEHA]," a protected activity. (Gov. Code, § 12940, subd. (h).) Section 1102.5 similarly prohibits an employer from retaliating against employees for engaging in protected activity, defined as disclosing to a government or law enforcement agency information reasonably believed to be "a violation of state or federal statute, or violation of noncompliance with a local, state or federal rule of regulation." (§ 1102.5, subd. (b).)

5

To establish a prima facie case of retaliation under either statute, plaintiffs must demonstrate (1) they were engaged in protected activity; (2) the employer subjected them to an adverse employment action — an action that materially affects the terms, conditions, or privileges of employment (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1052 (*Yanowitz*); and (3) there is a causal link between the protected activity and the adverse employment action. (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1125; *Patten v. Grant Joint Union High School Dist.* (2005) 134 Cal.App.4th 1378, 1384 (*Patten*).)

Gantt asserts he engaged in protected activity by disclosing what he reasonably believed were violations of the law. According to Gantt, complaints regarding the following conduct were protected activities: OPD's handling of the 2014 homicide investigation; Lieutenant A.'s management; junior officers' improper access to personnel information; and Lieutenant B.'s improper text messages. He also identifies his submission of a DFEH complaint and Government Claims Act claim as protected activities.

Gantt argues OPD subjected him to several adverse employment actions as a result of his protected activity, including: his 2014 removal from a homicide investigation; OPD's 2015 failure to investigate racist text messages; his January 2016 supervisory note; OPD investigating his text messages and the resulting suspension; the June 2016 investigation of his disclosure of homicide materials; the press release issued by the City's mayor regarding this investigation; and his ten-month administrative leave.[4] These

---

[4] In the trial court, Gantt argued Lieutenant A.'s alleged 2014 harassment and disparate enforcement of procedural rules also constituted adverse employment actions. He also claimed a June 2016 press release concerning an investigation into racist text messages was an adverse action. Gantt does not renew these arguments on appeal, and we consider them

facts, Gantt argues, permit an inference that OPD retaliated against him for engaging in protected activity.

But alleging protected activities, adverse employment actions, and a causal link merely shifts the burden to the employer to "provide a legitimate, nonretaliatory explanation for its acts." (*Patten, supra,* 134 Cal.App.4th at p. 1384; *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476 (*Flait*).) That is, an employer must "demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." (§ 1102.6.) For FEHA claims, in contrast, an employer must demonstrate a legitimate, nondiscriminatory reason for making an employment decision by a *preponderance of the evidence.* (*Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, 239, 241.) If the employer satisfies its burden, a plaintiff must then demonstrate the employer's explanation is pretextual or false. (*Patten,* at p. 1384; *Flait,* at p. 476.)

Gantt contends summary judgment was improper because there is a triable issue of fact regarding whether OPD retaliated against him for making protected disclosures within the meaning of FEHA and section 1102.5. He further asserts the City's proffered explanations for its actions were pretextual.

A court must grant summary judgment if there is no triable issue of any material fact, and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843.) We review de novo whether there is a triable issue of fact accepting as true the facts in evidence and reasonable inferences

---

forfeited. (*Tisher v. California Horse Racing Bd.* (1991) 231 Cal.App.3d 349, 361 [failure to raise issue in opening brief generally waives the issue].)

that can be drawn. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 67.) After construing the facts in the light most favorable to Gantt, we conclude the trial court correctly granted the City's motion for summary judgment. (*Aguilar*, at p. 843.)

### A.     Time-Barred Claims

At the outset, several of Gantt's retaliation claims are time-barred, including those arising from his 2014 removal from a homicide investigation, OPD's 2015 failure to investigate Lieutenant B.'s alleged racist text messages, and his January 2016 receipt of a supervisory note.

Consistent with the Government Claims Act, Gantt presented the City with a whistleblower claim for damages on November 1, 2016. (Gov. Code, §§ 905, 945.4.) The Government Code provides that a claim must be presented "not later than six months after the accrual of the cause of action." (*Id.*, § 911.2, subd. (a); *Canova v. Trustees of Imperial Irrigation Dist. Employee Pension Plan* (2007) 150 Cal.App.4th 1487, 1496 [date of accrual "is generally the date the plaintiff incurred injury as a result of the defendant's alleged wrongful act or omission"].) Thus, Gantt's section 1102.5 claims accruing before May 1, 2016 are time-barred.

Similarly, as required by FEHA, Gantt filed a complaint with DFEH on February 7, 2017, and he obtained a right to sue letter the same day. (*Guzman v. NBA Automotive, Inc.* (2021) 68 Cal.App.5th 1109, 1117 [filing a DFEH complaint is required to exhaust administrative remedies before filing a FEHA claim in court].) Government Code section 12960, former subdivision (d) required complainants to submit FEHA complaints within one

8

year of the date upon which the alleged unlawful practice occurred.[5]  As a result, any FEHA claims accruing before February 7, 2016, are also time-barred.

Gantt acknowledges these statutory limitations, but he insists his claims are timely under the continuing violation doctrine.  Under that doctrine, an employer is liable "for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct that occurred within the limitations period."  (*Yanowitz*, *supra*, 36 Cal.4th at p. 1056.)  Thus, "a series of separate retaliatory acts collectively may constitute an 'adverse employment action' even if some or all of the component acts might not be individually actionable."  (*Id*. at p. 1058.)  Conduct may constitute a continuing violation if the employer's unlawful actions are "(1) sufficiently similar in kind . . . (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence."  (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 823.)

But Gantt does not identify any frequent and ongoing unlawful conduct sufficiently similar to events that occurred after February 7 or May 1, 2016, the relevant time period here.  (*Yanowitz*, *supra*, 36 Cal.4th at p. 1056.)  Instead, he simply states the time-barred claims arise from his disagreements with Lieutenant A. and Lieutenant B.  This is insufficient.  Gantt filed his harassment claim against Lieutenant A. in December 2014, and he received a supervisory note in January 2016 — more than one year later.  He does not contend Lieutenant A. thereafter imposed any additional discipline or engaged in any additional unlawful conduct.  As for Lieutenant B., Gantt's briefs only address allegations that Lieutenant B. instigated a

_____

[5] The Legislature amended the statute, effective January 1, 2020, to allow for a limitations period of three years, but the amendment does not revive lapsed claims.  (Stats. 2019, ch. 709, §§ 1, 3.)

raid on the apartment of Gantt's girlfriend in 2016. (*Post*, p. 13.) Gantt does not identify any ongoing, frequent harassing conduct by Lieutenant B. (*Id.* at p. 1056, fn. 16 [pervasive workplace harassment may constitute adverse employment action].) Nor does he allege OPD engaged in ongoing harassment resulting in his constructive discharge, i.e., his early retirement. Gantt's retaliation claims based on the homicide investigation removal, failure to investigate Gantt's complaint, and supervisory note thus constitute " 'isolated employment decisions' " rather than pervasive workplace harassment.[6] (*Morgan, supra*, 88 Cal.App.4th at p. 66; *Yanowitz*, at p. 1056, fn. 16.) The continuing violation doctrine does not apply, and the claims are time-barred.

## B. Investigating Gantt's Text Messages and Suspension

Gantt argues his criticism of OPD's failure to investigate his complaint regarding the receipt of racist text messages caused OPD to subject him to adverse employment actions — the investigation of his homophobic text messages and resultant suspension. (*Yanowitz, supra*, 36 Cal.4th at p. 1061 [suspension is an adverse employment action].) Even assuming Gantt raised a triable issue of fact regarding the elements for a retaliation claim, the City presented clear and convincing evidence of a legitimate, non-retaliatory reason for suspending Gantt: he engaged in misconduct. (*Patten, supra*, 134 Cal.App.4th at p. 1384; *Flait, supra*, 3 Cal.App.4th at p. 476.)

In 2015, IAD investigated text messages Lieutenant B. sent to a group of officers, but it only addressed Gantt's allegations of age-based harassment. In April 2016, at Gantt's urging, IAD investigated an alleged racist image Lieutenant B. sent to Gantt and the same group of officers. Gantt emailed

---

[6] Because Gantt has not identified any sufficiently similar unlawful conduct, we do not address his arguments that the claimed adverse employment actions had not acquired a degree of permanence.

10

the investigator the image on May 19, 2016.  Seven days later, Gantt emailed the IAD investigator the entire text message thread, which included the image, between the officers.  But the thread also revealed that Gantt engaged in improper conduct by sending homophobic text messages.  As a result, IAD investigated Gantt's allegedly offensive text messages.

Investigating and ultimately suspending Gantt for making disparaging homophobic comments are legitimate, nonretaliatory explanations for an adverse employment action.  (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 354 [employees may not escape appropriate discipline by claiming retaliation].)  Indeed, there is no dispute that these messages violated OPD policies.  IAD concluded both Lieutenant B. and Gantt had engaged in unprofessional conduct, and OPD suspended both without pay in July 2016.  From this evidence, there is no reasonable inference that the suspension was retaliatory.  (*Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 283 ["summary judgment should not be granted unless the evidence cannot support any reasonable inference for plaintiff"].)

Arguing that this proffered explanation is merely pretextual, Gantt asserts the timing of these events — IAD investigating and suspending Gantt's conduct after he made a complaint — demonstrates OPD punished him in retaliation for making the complaint.  But "a temporal relationship alone is insufficient" to demonstrate retaliatory intent and avoid summary judgment.  (*Light v. Department of Parks & Recreation* (2017) 14 Cal.App.5th 75, 94.)  Once IAD investigated the text messages, it reviewed the communications of the other officers involved to determine whether there was any additional misconduct.  Upon identifying Gantt's improper text messages, OPD imposed the same penalty on Lieutenant B. and Gantt rather than treating them differently.  (*Wills v. Superior Ct.* (2011) 195 Cal.App.4th

143, 172 ["[s]howing disparate treatment or policy enforcement is a permissible means to establish pretext"].)  Gantt presents no evidence from which a reasonable factfinder could infer that his own misconduct was a factually baseless justification for suspension.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 363.)

### C.     Investigating Gantt's Disclosure of Homicide Materials

Gantt argues that, in retaliation for his April 2016 complaint about Lieutenant B.'s text messages, Lieutenant B. instigated a raid on the apartment of Gantt's girlfriend.  The raid, Gantt further argues, resulted in IAD investigating his disclosure of homicide materials.  Gantt fails to establish a triable issue of fact on the causal link between his 2016 complaint and the IAD investigation.  (*Guthrey v. State of California, supra,* 63 Cal.App.4th at p. 1125; *Patten, supra,* 134 Cal.App.4th at p. 1384.)

In June 2016, Gantt's girlfriend revealed on social media images of compact discs containing homicide investigation materials.  The woman then phoned Lieutenant B. and claimed Gantt asked her to transcribe interviews and jail calls of homicide suspects.  Lieutenant B., in turn, conveyed this information to other officers.  The girlfriend also emailed another officer claiming Gantt was "going to kill" her for disclosing this information.  Officers were dispatched to the girlfriend's apartment based on a concern for her safety and concern about the compromised homicide materials.  And IAD later investigated, among other things, whether Gantt disclosed or destroyed evidence in multiple criminal investigations.  Gantt admitted asking his girlfriend, a civilian, to transcribe these materials, and IAD sustained the allegations in June 2017, after he retired.

According to Gantt, this chain of events demonstrates Lieutenant B. instigated the police response, and a jury must determine whether the

lieutenant's motive was retaliatory. This inference, however, is not reasonably deducible from the evidence. (*Joseph E. Di Loreto, Inc. v. O'Neill* (1991) 1 Cal.App.4th 149, 161 ["[w]hen opposition to a motion for summary judgment is based on inferences, those inferences must be reasonably deducible from the evidence, and not such as are derived from speculation"].) Gantt's girlfriend undisputedly disclosed the homicide materials, contacted OPD, and reported a concern for her safety. After multiple officers received the girlfriend's communications, they notified OPD superiors. The assistant police chief, not Lieutenant B., dispatched officers to her apartment. Lieutenant B's motives are not dispositive here.

Gantt insists his girlfriend did not actually fear him, thus undermining Lieutenant B.'s general motives for instigating the "raid to protect" his girlfriend. But whether the girlfriend feared Gantt when she contacted OPD, a disputed fact, is not material. Her communications and her disclosures, not Lieutenant B., prompted the department's investigation. The evidence does not support a reasonable inference that the complained-of actions were retaliatory. (*Nazir*, *supra*, 178 Cal.App.4th at p. 283.)

### D. Mayor's Press Release

Gantt next contends that a press release issued by the City's mayor following the raid of his girlfriend's apartment constitutes retaliation. We disagree.

There is no meaningful factual dispute over the content of the press release, which noted the district attorney was investigating alleged misconduct by a member of the OPD. The release — a publication made "[i]n the proper discharge of an official duty" and regarding OPD conduct — is privileged as a matter of law. (Civ. Code, § 47, subd. (a); *Vivian v. Labrucherie* (2013) 214 Cal.App.4th 267, 277 [police misconduct is a public

13

concern].) Privileged statements cannot form the basis of retaliation claims. (*Laker v. Board of Trustees of Cal. State Univ.* (2019) 32 Cal.App.5th 745, 778; *Howard v. Oakland Tribune* (1988) 199 Cal.App.3d 1124, 1128 [summary judgment appropriate where applicability of privilege to uncontradicted facts is a question of law].)

Gantt attempts to avoid the privilege, arguing the relevant inquiry is whether OPD provided the mayor false information — that the case was being referred to the district attorney even though OPD preliminarily determined Gantt did not commit any crimes — that ultimately prompted the mayor's press release. This is unconvincing. Gantt's claimed adverse employment action is the reputational harm flowing from the press release, not OPD's disclosures. In addition, the press release does not mention Gantt's name, rendering his claimed damage speculative. (Cf. *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1456 [reduced promotional opportunities caused by negative performance review directly identifying plaintiff and damaging her reputation may constitute adverse employment action].) The trial court properly granted the City summary judgment on this claim.

### E.    Length of Administrative Leave

Gantt argues the length of his ten-month administrative leave during IAD's investigation of his domestic dispute was excessive, and thus an adverse employment action. As an initial matter, Gantt fails to identify any causal link between a protected activity and the length of his leave. And even assuming this raises a triable issue of fact for the elements of a prima facie case for retaliation, Gantt's claim nonetheless fails. The City provided clear and convincing evidence that Gantt was the subject of multiple, simultaneous IAD investigations for alleged misconduct, a legitimate basis

14

for Gantt's lengthy administrative leave. (*Mize-Kurzman v. Marin Community College Dist.* (2012) 202 Cal.App.4th 832, 862 [employers satisfy burden of providing a legitimate reason for adverse employment action if it "reasonably believed their conduct was justified on the basis of evidence separate and apart from the fact that the employee made a protected disclosure"].)

On April 14, 2016, and based on Gantt's own report, IAD opened an investigation of Gantt's domestic dispute with his wife. Gantt allegedly pushed and kicked his wife and pointed a gun at her during this incident. His wife was not injured, and she did not press charges against him. The next day, OPD placed Gantt on administrative leave. Although the investigation continued through October 2016, there were several weeks when IAD officers did not appear to work on Gantt's case. In any event, IAD's October 2016 report exonerated Gantt regarding the firearm allegation and it concluded there was insufficient evidence he engaged in domestic violence. But Gantt remained on administrative leave for four more months, until February 21, 2017.

The City, however, produced evidence that OPD did not tie Gantt's administrative leave solely to this investigation. During his leave, IAD investigated the June 11, 2016 complaint regarding Gantt's disclosure of homicide materials to his girlfriend. That same month, IAD opened a new investigation into a civilian complaint that Gantt did not properly investigate a 2011 homicide. During that investigation, IAD discovered several boxes of evidence at Gantt's desk that were not properly maintained or returned to evidence. For that reason, IAD opened a related, secondary investigation in September 2016.

These investigations extended beyond the timelines for investigating Gantt's domestic dispute. IAD sustained findings on the civilian complaint that he violated OPD policies by failing to return homicide materials containing witness testimony on November 28, 2016, and OPD agreed with that conclusion on December 13, 2016. For the secondary investigation, OPD agreed with IAD's findings that Gantt failed to properly maintain evidence in April 2017. And IAD completed its report regarding Gantt's alleged disclosure of homicide materials in December 2016. After Gantt retired, OPD notified him in June 2017 that he would be subject to discipline if he returned to work.

The evidence that OPD kept Gantt on excessive administrative leave to retaliate against him is weak. (*Colarossi v. Coty US Inc.* (2002) 97 Cal.App.4th 1142, 1154.) Gantt argues the length of IAD's domestic dispute investigation violated OPD policy for completing investigations within six months. But this timeline appears aspirational rather than based on any statute. Generally, public agencies like IAD must complete their investigations within one year of discovering misconduct. (Gov. Code, § 3304, subd. (d).) Per the former head of IAD, the division strived to complete investigations within six months but sometimes extended that deadline due to the complexity of the issues. Here, the IAD investigation of the domestic dispute did not exceed one year.

Relying on two IAD officer statements, Gantt also declares OPD uses IAD investigations to retaliate against officers, including him. One investigator questioned OPD's insistence on investigating Gantt's conduct unrelated to his 2016 domestic dispute. Another investigator noted, depending on the subject, some domestic violence investigations were narrow and closed quickly, often without discipline, while others were expanded,

16

kept open for many months, and resulted in discipline. Reliance on these declarations is misplaced. Rather than expanding Gantt's domestic dispute investigation, IAD initiated multiple investigations triggered by third-party complaints unrelated to the domestic dispute. The City presented evidence that OPD initiates IAD investigations when it receives information that discloses any accusation of misconduct by OPD personnel, and that an officer has a mandatory obligation to report information regarding potential misconduct. Consistent with this policy, IAD opened additional investigations after Gantt's girlfriend and another civilian notified OPD of Gantt's misconduct.

Finally, there is no merit to Gantt's speculative assertion that Lieutenant A. improperly influenced these IAD investigations. Aside from noting Lieutenant A. once worked in IAD and was a high ranking OPD officer, Gantt fails to cite anything in the record to support this claim. (*Joseph*, *supra*, 1 Cal.App.4th at p. 161.) The "evidence as a whole is insufficient to permit a rational inference that [OPD's] actual motive" in keeping Gantt on extended administrative leave was discriminatory or retaliatory. (*Guz v. Bechtel National, Inc.*, *supra*, 24 Cal.4th at p. 361; *Colarossi v. Coty US Inc.*, *supra*, 97 Cal.App.4th at p. 1153.) Summary judgment for the City was proper.

## II. Post-Summary Judgment Orders

We reject Gantt's assertion that Judge Reilly erroneously denied his motion for a new trial because he was not the one to rule on Gantt's summary judgment motion. Generally, the judge who presided at trial, in this case Judge Markman, must hear motions for a new trial. (Code Civ. Proc., § 661.) But a different judge of the same court may hear the motion if the original judge is unable or absent at the time of the hearing. (*Ibid.*) After Judge

17

Markman granted the City summary judgment, Gantt's case was reassigned to Judge Reilly for all purposes, indicating Judge Markman's unavailability or absence. (*Mackey v. Superior Court* (1990) 221 Cal.App.3d 1124, 1126 [under the direct calendaring system, "the judge normally assigned to that department would, barring unforeseen circumstances, preside over all matters in the case, including trial"].) The record does not indicate Judge Markman was otherwise present or able to hear the motion for a new trial. (Cf. *Francis v. Superior Court of Los Angeles County* (1935) 3 Cal.2d 19, 27 [new judge improperly heard motion for new trial where an affidavit noted the original judge was "sitting in his department and was available for his usual duties"].)

Nor did Judge Reilly err by entering the judgment rendered by Judge Markman, contrary to Gantt's assertions. A successor judge may enter a judgment, a ministerial task, once the judgment has been rendered. (*Hayward Union High Sch. Dist. of Alameda County v. Madrid* (1965) 234 Cal.App.2d 100, 114; *Brown v. Superior Court of Los Angeles County* (1925) 70 Cal.App.732, 735.) There was no impropriety in this sequence of events. Gantt's cited authorities do not alter this conclusion.

## DISPOSITION

The judgment is affirmed. The City is entitled to its costs on appeal.

18

_____

Rodríguez, J.

WE CONCUR:


_____

Fujisaki, Acting P. J.


_____

Brown, J.*


A161268


---

\* Associate Justice of the Court of Appeal, First Appellate District, Division Four, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

19